912 A.2d 735 (2006)
389 N.J. Super. 241
STATE of New Jersey, Plaintiff-Respondent,
v.
Ryan BUDA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted November 1, 2006.
Decided December 20, 2006.
*736 Yvonne Smith Segars, Public Defender, attorney for appellant (Jean M. Hartmann, Designated Counsel, of counsel and on the brief).
Thomas F. Kelaher, Ocean County Prosecutor, attorney for respondent (Samuel Marzarella, Senior Assistant Prosecutor, of counsel; Roberta DiBiase, Assistant Prosecutor, on the brief).
Before Judges STERN, SABATINO and MESSANO.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant was convicted by a jury of three counts of second degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a), and one count of third degree aggravated assault, N.J.S.A. 2C:12-1(b)(7). Defendant was sentenced to eight years in the custody of the Commissioner of Corrections on count three, one of the second degree endangering convictions, and to concurrent seven-year terms for the other endangering convictions. He also received a concurrent five-year term for the aggravated assault.
On this appeal defendant raises issues relating to the sufficiency of the evidence, the introduction of testimony, and the jury instructions. He also challenges the sentence. Because we conclude that the admission of testimony by a DYFS worker who interviewed the victim at a hospital after the third incident of alleged child abuse was not harmless, we reverse the conviction. Specifically, we hold that the statement to the DYFS worker was inadmissible under the Confrontation Clause of the Sixth Amendment to the Federal Constitution (and the co-extensive provisions of the New Jersey Constitution, see N.J. Const., art. I, ¶ 10; State v. Daniels, 364 N.J.Super. 357, 371-72, 835 A.2d 1261 (App.Div.2003), rev'd on other grounds, 182 N.J. 80, 861 A.2d 808 (2004))[1], and cannot constitute harmless error. In so doing, we sustain the introduction of other statements which were admissible under traditional hearsay exceptions and present no concerns under the Confrontation Clause. Those statements may be admitted on the retrial.

I.
For purposes of our analysis of the present record, we adopt the State's version of facts as detailed in its brief.

*737 The three-year old victim in this case, N.M., was [allegedly] assaulted by defendant on three separate occasions between July 2nd and October 18th, 2002. The last assault was the most severe, resulting in injuries to the child that required a two-week hospital stay. Specifically, Dr. Steven Kairys, the Chairman of Pediatrics and Director of the Child Protection Center at Jersey Shore University Medical Center, found "extensive injuries primarily to the head, the scalp, the eyes, the ears, the back of the neck. . . . a combination of extensive bruising that covered large parts of his neck and scalp. Both eyes were bruised . . . were beginning to show what's called raccoon eyes, bleeding blood around the eyes. Both ears were swollen red. There was bruising both in the earlobes, themselves, as well as behind the earlobes. There was bruising along the neck."
The victim had been residing in defendant's home for a brief period before the first injury occurred. Prior thereto, the child had never suffered a suspicious injury and DYFS had never been involved in preserving his safety and well-being. The child had been living with his teenage mother and her parents since his birth in November of 1998, but had been placed in defendant's home and in harm's way[2] when his mother moved in with defendant upon their engagement. As part of joining together as a family, defendant wanted and encouraged little N.M. to call him "Daddy." The boy's mother, defendant and N.M. did things together that families typically enjoy, such as having dinner, watching TV, playing cards, watching fireworks, going out for ice cream and going to parks.
The first indication that N.M. was being physically abused by defendant was on July 3rd, 2002. That morning, as N.M.'s mother [Christine] was driving the boy to her sister's house for daycare, as she usually did on weekdays when she worked, he blurted out from the backseat that, "Daddy beat me." The statement was voluntary and unsolicited. Christine was understandably surprised by the remark[] and asked N.M. when that had happened, to which the boy responded, "[a]t night."
Later that day, Christine received a phone call at work from her mother . . . advising that N.M. had an injury to his buttocks. Unbeknownst to Christine at that time, [Christine's mother and sister] took photos of the bruising, which to them looked to be in the shape of a handprint.
Christine asked defendant about the injury to N.M.'s buttocks; defendant said the boy had fallen in the bathtub. Christine accepted defendant's explanation and, at least for the time being, the episode was over.
The next incident was sometime in the month of August or September 2002. Again out of the presence of Christine, N.M. allegedly "fell" after getting out of the bathtub. When Christine returned home, defendant and his brother . . . who was also present in the house, told her about the alleged fall. Some small bruises were noticeable, so Christine called Community Medical Center to inquire as to what she should do. She was told to just watch the child carefully for certain neurological symptoms and *738 to bring him in only if his condition appeared to worsen.
The following day, while N.M. was at his grandparents' house, his grandfather [Christine's father] noticed the bruises on the child's head, and more photos were taken. The grandparents then kept N.M. at their home for several days after this incident, having argued with their daughter Christine about defendant abusing the child but Christine still not believing that he had inflicted those injuries.
On October 16, 2002, while [Christine's sister] was babysitting, defendant arrived to pick him up and bring him home. N.M. became visibly upset at the realization that he was going to leave his aunt's house with defendant, and he said he didn't want to go home with "Ryan." Defendant became upset at the child's failure to call him "Daddy," and an argument ensued between defendant and [the aunt]. [The aunt] accused defendant of being an abuser and refused to hand the child over to him. The police were summoned to the house and, upon their call to Christine to inquire whether defendant had her permission to take the child, N.M. was sent home with defendant. Neither [the aunt] nor his grandparents saw N.M. again until the night of October 18, 2002.
On the morning of October 18, Christine left N.M. in the care of defendant when she went to work, altering her usual routine of bringing him to [her sister's] house. She testified that when she returned in the early evening, N.M. was sitting in the darkened living room watching television. After getting herself settled, she approached N.M. and screamed out loud when she noticed a big red mark on the back of his neck. There were also marks or discolorations under his eyes.
N.M. was taken to the emergency room at Community Medical Center, where a doctor who examined the child immediately called DYFS and other authorities to report his suspicion that N.M. had been abused.
Miriam Nurudeen, the "first response" DYFS worker who was sent to the hospital to investigate, arrived at the child's room about the same time as [the grandparents]. The child was crying and begging his grandparents to take him home with them. Ms. Nurudeen asked [Christine's parents] to leave the room so that she could talk to N.M. alone, which is standard procedure when a DYFS representative is attempting to ascertain if a child has been abused.
Once the grandparents were gone, Ms. Nurudeen asked N.M. what had happened to him. He said that he fell in his room, and he wanted to go home to grandma. She then asked him if anybody had beaten him. The child responded, "Dad says nobody beat me. I fell when I was sleeping in my room."
Officer Kenneth Hess also responded to Community Medical Center and asked N.M. how he was doing. The child replied, "[m]y heart hurts."
N.M. was transferred to Jersey Shore Medical Center later that night, where he spent two weeks recovering from his injuries in the pediatric intensive care unit.
Also later that night, defendant was interviewed by Investigator Kenneth Hess of the Ocean County Prosecutor's Office and Detective Brian Lomer of the Dover Township Police Department. Defendant was given his [Miranda] rights, which he waived in writing. He denied inflicting any physical abuse on N.M. but told the officers that the child had fallen on two prior occasions, and maybe the child had fallen again on that *739 day. He did not tell the officers that anyone had been home with him all day except for the child.
Dr. Steven Kairys testified as an expert in pediatric medicine and identification of child abuse injuries. He told the jury that he examined N.M. on October 21st, at which time he found extensive injuries to the child's head, scalp, eyes, ears and neck, with lesser injuries to his left flank and scrotum. His eyes were dark and swollen, as were his ears. There were also large areas of blood collecting under his scalp. The manifestation of the injuries had worsened significantly from the night they were discovered, on October 18, and the child had lost a lot of blood internally. The doctor testified that the injuries to the child were purposely inflicted upon him and were not the result of a fall, as evidenced by their type and pattern.
Defendant and Christine were charged with endangering the welfare of a child. Defendant was also charged with third degree assault on N.M. for the October 18th incident. Christine was not allowed to see N.M. for three and a half months, and then only under supervision. Upon his release from the hospital, N.M. went to live with his grandparents. Christine eventually entered into a plea bargain with the State to testify truthfully against defendant, in exchange for which she pled to a lesser charge and the State agreed not to seek incarceration.
At trial, defendant and his mother, Joyce Hart[e], both testified that she was with him all day at his home on October 18th and that neither one saw anything happen to the child. When asked why they had not told anyone earlier that Ms. Hart was allegedly at the house all day, defendant testified it was because Ms. Hart had a warrant outstanding for her arrest. However, the outstanding warrant did not prevent Ms. Hart from bringing defendant and her other son to the police station for questioning, where she waited for over two hours on a bench in a common area.
Defendant testified at trial that he did not assault or harm N.M. at any time. He blamed Christine's parents for the accusations of abuse, supposedly because they did not want N.M. to move out of their house in the first place. After his conviction and at his sentencing, defendant still claimed that he never hurt N.M.

II.
Defendant challenges the admission of N.M.'s statements that "Daddy beat me" to his mother while they were riding in the car together on July 3, 2002. Defendant also contends that the statements, "I fell down in my room. I want to go home to grandma" and "Dad says nobody beat me. I fell when I was sleeping in my room," made to the DYFS worker at the Medical Center on October 18, 2002 were inadmissible. Defendant claims the statements were "inadmissible hearsay" and violated his constitutional right to confrontation. Clearly, the admission of the statements at the hospital must have prejudiced defendant, particularly in light of the July statement and the fact that the words "Dad says nobody beat me" were stated in response to the DYFS worker's "direct question" asking "if anybody beat him."
After an N.J.R.E. 104 hearing and deferring a ruling until hearing part of the State's case, the trial judge concluded that both statements were admissible as "excited utterances," N.J.R.E. 803(C)(2). Such statements must be made "while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." *740 Ibid. See generally, State v. Branch, 182 N.J. 338, 357-67, 370, 865 A.2d 673 (2005) (excluding child's statement because she "had the opportunity to deliberate before making the statement." Id. at 370, 865 A.2d 673); State v. Cotto, 182 N.J. 316, 329-31, 865 A.2d 660 (2005) (narrative responses to police questions "not sufficiently spontaneous to assure reliability").
While the statements in this case were each made at least several hours after the events occurred, we cannot conclude that the trial judge abused his discretion in finding that the prerequisites for admitting the statements under the Rule were satisfied. The judge could have reasonably found on the record presented that the then three-and-one-half and four-year-old child addressed the beatings at the first opportunity he had to do so, while still nervous and excited. The October statement was not made to a family member, was in response to an interrogation interview, and could have been made earlier to N.M.'s mother either when she observed the marks or en route to the hospital. However, defendant was with them at the time. While admission of the statement to DYFS worker Nurudeen, a Supervising Family Service Specialist, therefore presents a closer question under N.J.R.E. 803(c)(2), see State v. Branch, supra, at 370, 865 A.2d 673, we nevertheless decline to hold that the inferences preclude the finding that both statements were made in response to a "startling event" while N.M. was "under the stress of excitement caused by the event or condition" and were made "without an opportunity to deliberate or fabricate." N.J.R.E. 803(c)(2). See State v.Bass, 221 N.J.Super. 466, 480-81, 535 A.2d 1 (App.Div.1987), certif. denied, 110 N.J. 186, 540 A.2d 182 (1988); State in Interest of C.A., 201 N.J.Super. 28, 32-33, 492 A.2d 683 (App.Div.1985). According to Ms. Nurudeen, when she arrived at the hospital, N.M. "was crying" and "very emotional," and his grandparents helped her "calm him down." N.M. "was crying" and "scared" while talking to Ms. Nurudeen. Moreover, unlike the statement to a police officer in Branch, in this case there was no prior discussion with the child declarant about the identification of the perpetrator and the child's statement did not relate to the identification of a stranger.[3]See also State v. Cotto, supra, (statements to police by adults).

III.
Recent case law requires reconsideration of the admission of the excited utterances in light of the Confrontation Clause.
In Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177, 194 (2004), the United States Supreme Court held that the Sixth Amendment prohibits "admission of testimonial statements *741 of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." More recently, the Court considered the meaning of "testimonial" evidence in Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).[4] The Court made clear that:
[s]tatements are non-testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
[Id. at ___, 126 S.Ct. at 2273-74, 165 L.Ed.2d at 237.][5]
In Davis, defendant was convicted of felony violation of a domestic no-contact order, id. at ___, 126 S.Ct. at 2271, 165 L.Ed.2d at 235, based on the contents of a recorded 911 telephone call during which the police dispatcher ascertained the perpetrator's name and a description of what was occurring. Id. at ___, 126 S.Ct. at 2271, 165 L.Ed.2d at 234-35. The conviction was upheld by the Washington Supreme Court because "the portion of the 911 conversation in which [defendant was identified] was not testimonial, and [] if other portions of the conversation were testimonial, admitting them was harmless beyond a reasonable doubt" Id. at ___, 126 S.Ct. 2271-72, 165 L.Ed.2d at 235. In Hammon v. Indiana, decided with Davis, the police responded to the scene of a reported domestic disturbance, asked some questions, and had the wife "fill out and sign a battery affidavit." Id. at ___, 126 S.Ct. at 2272, 165 L.Ed.2d at 235. The wife did not testify at trial; the officer who had questioned her recounted her statements at the scene. Id. at ___, 126 S.Ct. at 2272, 165 L.Ed.2d at 236. Hammon's conviction for domestic battery was sustained by the Indiana Supreme Court, because the wife's oral statements were not "testimonial," as they constituted "excited utterances," id. at ___, 126 S.Ct. at 2273, 165 L.Ed.2d at 236, and while the affidavit was "testimonial," its admission was harmless beyond a reasonable doubt. Ibid.
The Davis Court made clear that "interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" constituted "testimonial hearsay." Id. at ___, 126 S.Ct. at 2276, 165 L.Ed.2d at 240. However, "at least the initial interrogation conducted in connection with a 911 call[] is ordinarily not designed primarily to `establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." Ibid. As a result, the Court determined that the circumstances surrounding the 911 call in Davis "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency[,]" and therefore admissible. Simply *742 stated, the wife "was not acting as a witness; she was not testifying." Id. at ___, 126 S.Ct. at 2277, 165 L.Ed.2d at 240.[6]
However, the Court reversed the Indiana conviction in Hammon. In that case, "[t]here was no emergency in progress" and when the officers responded to the scene, the victim stated there was "no immediate threat to her person." Id. at ___, 126 S.Ct. at 2278, 165 L.Ed.2d at 242. The officer questioning the wife was "not seeking to determine (as in Davis) `what is happening,' but rather `what happened.'" Ibid. "Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime  which is, of course, precisely what the officer should have done." Ibid. Of significance, the interrogation was conducted away from the perpetrator, although not conducted in a police station or similar environment, the statement recounted "how potentially criminal past events began and progressed," and the interrogation "took place some time after the events described were over." Ibid.[7]
As Davis makes clear, "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." Id. at ___, 126 S.Ct. at 2274, 165 L.Ed.2d at 237, n. 1. While the portions of the 911 call concerning events as they were actually happening, were non-testimonial, the Court stated that "[i]t could readily be maintained" that aspects of the call occurring after the event occurred and the perpetrator left the scene "were testimonial." Id. at ___, 126 S.Ct. at 2277, 165 L.Ed.2d at 241. Hence, courts considering 911 calls following the decision in Davis have held that a report of an ongoing event or transaction was "non-testimonial." See, e.g., Commonwealth v. Galicia, 447 Mass. 737, 857 N.E.2d 463, 470 (2006) (statement to 911 operator "about an assault that was actually happening" admissible, but statements of victim to officers responding to scene inadmissible); United States v. Thomas, 453 F.3d 838 (7th Cir. 2006); Jackson v. State, 931 So.2d 1062 (Fla.Dist.Ct.App.2006); Cook v. State, 199 S.W.3d 495 (Tex.App.2006); Harkins v. State, 143 P.3d 706 (Nev.2006); Cook v. State, 199 S.W.3d 495 (Tex.App.2006).
The Davis Court assumed that 911 operators "may be at least agents of law enforcement when they conduct interrogations of 911 callers," Davis, supra, ___ U.S. at ___, 126 S.Ct. at 2274, 165 L.Ed.2d at 238, n. 2, although the Court found it "unnecessary to consider whether and when statements made to someone other than law enforcement personnel are `testimonial[.]'" Ibid. Without definitively addressing the issue of agency when DYFS workers investigate a complaint of abuse, see generally State v. P.Z., 152 N.J. 86, 703 A.2d 901 (1997), we note that a recent report of the Joint Sub-Committee of the Criminal and Family Practice Committees recommended procedures for handling issues in child abuse cases involving *743 simultaneous DYFS proceedings and criminal charges,[8] and we can take note of the fact that some interviews of victims of abuse are conducted by DYFS workers in the presence of law enforcement officers. In fact, DYFS is charged with taking action, using court proceedings, to protect the best interests of a child and "shall immediately report all instances of suspected child abuse and neglect" to the County Prosecutor. N.J.S.A. 9:6-8.36a; see also N.J.A.C. 10:129-1.4. In this case, the responding DYFS worker talked with Prosecutor's Investigator Kenneth Hess before interviewing N.M. Moreover, and significantly, she was called to the hospital to conduct an investigation, because the examining physician suspected wrongdoing. In these circumstances, we hold that the statement of N.M., who did not testify at trial, to the DYFS worker was "testimonial" and inadmissible.
The trial judge considered the impact of Crawford in making his ruling. He concluded that because Crawford did not "overrule" White v. Illinois, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), which held that "spontaneous declarations" by child victims to an investigating police officer were admissible, the Supreme Court did not believe "spontaneous declarations by children violate[d] the confrontation clause or [] necessarily [were to be] considered testimonial."
There was merit to the judge's position at the time of the ruling, because of Crawford's discussion of White. Crawford, supra, 541 U.S. at 58, 124 S.Ct. at 1368, 158 L.Ed.2d at 197, n. 8. However, Davis referred to White as "one arguable exception" to the proposition that the Court "never in practice dispensed with the Confrontation Clause requirements of unavailability and prior cross-examination in cases that involved testimonial hearsay." Davis, supra, ___ U.S. at ___, 126 S.Ct. at 2275, 165 L.Ed.2d at 239. See also id. at ___, 126 S.Ct. at 2280-84, 165 L.Ed.2d at 244-48 (Thomas, J., concurring and dissenting). However, as Davis makes abundantly clear, Crawford overruled Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and precludes admission of testimonial statements even when they previously were based on a "firmly rooted hearsay exception" in the absence of unavailability and prior cross-examination. Davis, supra, ___ U.S. at ___, 126 S.Ct. at 2275, 165 L.Ed.2d at 239, n. 4. Davis (Hammon) rejected a rule that statements taken at the crime scene are admissible in all instances; the fact that Amy Hammon's initial statements were made at the "crime scene" was "immaterial." Id. at ___, 126 S.Ct. at 2279, 165 L.Ed.2d at 243. It is also clear that Davis rejected the notion that Crawford related only to "formal" statements. Id. at ___, 126 S.Ct. at 2278, 165 L.Ed.2d at 242-43, n. 5; id. at ___, 126 S.Ct. at 2280-85, 165 L.Ed.2d at 244-49 (Thomas, J., concurring and dissenting).[9]
*744 In White, statements by a four-year old girl to her babysitter, her mother, an investigating police officer, an emergency room nurse, and a doctor were deemed admissible, and the Court rejected a holding that the witness had to be produced or found to be "unavailable." White, supra, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). There, "spontaneous declarations" and statements made in the course of medical treatment were deemed to have "sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule," thereby satisfying the Confrontation Clause. Id. at 356, 112 S.Ct. at 743, 116 L.Ed.2d at 859. The Court found no basis "for excluding from trial, under the aegis of the Confrontation Clause, evidence embraced within such exceptions to the hearsay rule as those for spontaneous declarations and statements made for medical treatment." Id. at 357, 112 S.Ct. at 743, 116 L.Ed.2d at 860.
But White involved an interpretation of Ohio v. Roberts and the Court's subsequent opinion in United States v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), and Roberts was overruled in Crawford, where the Court concluded that the "firmly rooted hearsay exception" and "particularized guarantees of trustworthiness" approach "departs from the historical principles" underlying the Confrontation Clause. Crawford, supra, 541 U.S. at 60, 124 S.Ct. at 1369, 158 L.Ed.2d at 198. Crawford specifically noted that it "casts doubt on" White, although it "need not definitively resolve whether [White] survives [the Court's] decision [in Crawford]." Id. at 61, 124 S.Ct. at 1370, 158 L.Ed.2d at 199. In any event, Crawford holds that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for confrontation[,]" id. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203, and that "the only indicia of reliability sufficient to satisfy constitutional demands is one the Constitution actually prescribes: confrontation." Id. at 68-69, 124 S.Ct. at 1374, 158 L.Ed.2d at 203. As a result, and given the references to White in the Davis opinions, we cannot consider it any more viable than Roberts.[10]
For these reasons, courts across the country following Crawford have held that statements to a governmental agent investigating *745 an allegation of abuse or a witness assessing the circumstances relating to the claim of possible child abuse are "testimonial," because of the potential of a criminal prosecution. See United States v. Bordeaux, 400 F.3d 548 (8th Cir.2005) (reversal where statement was made to "forensic interviewer" and child testified by closed circuit television); State v. Snowden, 385 Md. 64, 867 A.2d 314 (2005) (statement to social worker inadmissible); People v. Sisavath, 118 Cal.App.4th 1396, 13 Cal.Rptr.3d 753 (2004) (child victim statement to forensic specialist inadmissible). The holdings remain the same after Davis. See State v. Justus, 205 S.W.3d 872 (Mo.2006) (while social worker's job was to protect child, "primary purpose" of statements was to establish past events); State v. Blue, 717 N.W.2d 558 (N.D.2006) (videotaped statement to forensic interviewer at child advocacy center inadmissible); State v. Pitt, 209 Or.App. 270, 147 P.3d 940 (2006) (videotaped interviews of child victims at a child abuse assessment center were critical to the State's case and inadmissible). Compare pre-Davis cases, People v. Vigil, 127 P.3d 916 (Colo.2006) (evidence statement taken for medical treatment admissible); State v. Bobadilla, 709 N.W.2d 243 (Minn.2006) (statement to child protection worker taken to protect child admissible).
The October statement involved in this case was taken when N.M. was no longer in danger and there was no "ongoing emergency." Davis, supra, ___ U.S. at ___, 126 S.Ct. at 2273-74, 165 L.Ed.2d at 237. As a result the statement must be deemed testimonial, and admissible only if the declarant was unavailable and defendant had a prior opportunity to cross-examine the declarant. There is no claim in this case that the witness was unavailable or that there was a "prior opportunity for cross-examination." Nor is there a claim that the defendant somehow prevented the witness from testifying, which can be deemed a forfeiture or waiver of the Sixth Amendment right to confrontation. See Davis, supra, ___ U.S. at ___, 126 S.Ct. at 2279-80, 165 L.Ed.2d at 244; Crawford, supra, 541 U.S. at 62, 124 S.Ct. at 1370, 158 L.Ed.2d at 199.
As the statement in question was both offered and received for the substance of what was said, and because there is no contention or basis for a finding of harmless error in terms of its impact on any count, we reverse the conviction on all counts. In doing so, we make clear that the statement or "blurt out" to N.M.'s mother after the first incident in July would pose no problem under Crawford or Davis in terms of admissibility at any retrial.[11] We also believe that our opinion may be read to be consistent with that part of State in the Interest of J.A., 385 N.J.Super. 544, 897 A.2d 1119 (App.Div. 2006), in which we noted that "spontaneous or volunteered statements to law enforcement officers, or statements that are in response to open-ended or minimal question by law enforcement, particularly those at the scene of the crime" are admissible, as are responses to "on-the-spot police questioning" if not aimed at producing or preserving evidence. Id. at 555, 556, 897 A.2d 1119. However, a statement to a DYFS worker who reports to a hospital in response to a call concerning possible child abuse, even if taken outside the presence of a police officer or prosecutor's investigator, *746 is taken to gather evidence for use in court proceedings if it is decided that action for protection of the child is required. Here, the interview by the DYFS worker was not at the scene or while the abuse was occurring; it was at the hospital where the victim was being treated.
Accordingly, we must reverse the conviction based upon the statement admitted through the DYFS worker.
We generally agree with the additional comments of our concurring colleague, particularly about the fact-sensitive nature of the analysis and the need for a case-by-case development of the law. We add only that we find no case failing to apply the Crawford-Davis rule to a direct appeal, given the impact of its principle to the truth-telling function. See, e.g., Griffith v. Kentucky, 479 U.S. 314, 322-28, 107 S.Ct. 708, 712-16, 93 L.Ed.2d 649, 658-61 (1987); State v. Natale, 184 N.J. 458, 481, 492-96, 878 A.2d 724 (2005); State v. Fortin, 178 N.J. 540, 647-48, 843 A.2d 974 (2004); State v. Purnell, 161 N.J. 44, 58-64, 735 A.2d 513 (1999). See also Commonwealth v. Galicia, supra, 857 N.E.2d at 470.
In light of our reversal, we do not have to discuss the other issues raised or sentence imposed. But see State v. Natale, 184 N.J. 458, 878 A.2d 724 (2005); see also State v. Pierce, 188 N.J. 155, 902 A.2d 1195 (2006) (remanding when aggravating factors three, six and nine utilized).
We remand the matter for a new trial.
SABATINO, J.S.C., temporarily assigned, concurring.
I concur in the judgment vacating defendant's conviction and remanding for a new trial. I write separately to make explicit certain assumptions in our Confrontation Clause analysis, and also to underscore what I perceive to be the exceedingly close and fact-sensitive nature of the issues before us.
The United States Supreme Court's opinion in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) redefining the constitutional standards for the admissibility of hearsay against a criminal defendant, and its recent amplification of Crawford's "testimonial" analysis in Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), has enormously changed the course of jurisprudence under the Confrontation Clause. More significantly, in displacing the former two-part test of Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980) (allowing statements which categorically satisfied certain "firmly rooted" hearsay exceptions or which otherwise had "particularized guarantees of trustworthiness"), Crawford has dramatically affected the day-to-day prosecution of criminal trials and appeals across the nation. See, e.g., Michael D. Cicchini & Vincent Rust, Confrontation After Crawford v. Washington: Defining "Testimonial", 10 Lewis & Clark L.Rev. 531 (2006); Jerome C. Latimer, Confrontation After Crawford: The Decision's Impact on How Hearsay Is Analyzed Under the Confrontation Clause, 36 Seton Hall L.Rev. 327 (2006); The Supreme Court, 2006 Term-Leading Cases, 120 Harv. L.Rev. 125, 213 (2006).
Following Crawford, out-of-court statements that formerly were routinely admitted against defendants under recognized hearsay exceptions  such as excited utterances, statements to physicians, and business or public records  are now inadmissible for their truth if they are judicially deemed "testimonial" in nature and the declarants cannot be cross-examined. This sea change in criminal practice cannot *747 be underestimated.[1] In making that observation, I do not question the historical or doctrinal merits of Crawford in fulfilling the intended aims of the Confrontation Clause. I simply note that the practical implications of Crawford and its progeny are very substantial, and that we as an appellate court[2] have an obligation to be mindful of those practicalities in applying the tenets of these new rules of constitutional law.
Recognizing the avulsive changes in law and in practice brought about by Crawford, it is worth noting that the Supreme Court declined in that case to supply the bench and bar with a "comprehensive definition" of what is testimonial under the Court's new standards. Crawford, supra, 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203. Instead, the Court left that task to a later day. That day arrived, at least in part, on June 19, 2006, when the Court decided Davis and a companion case, Hammon v. Indiana, in a consolidated opinion that put some meat on Crawford's bare doctrinal bones. It is also worth noting that the trial in the present appeal was conducted in January 2005, ten months after Crawford was decided but more than a year before the Supreme Court clarified its teachings in Davis.
The majority's scholarly opinion faithfully applies the post-Crawford standards expressed in Davis to this case retroactively, even though the trial judge, the prosecutor and defense counsel could not have reasonably predicted in January 2005 the specific doctrinal rules announced in Davis in June 2006. On that score, the United States Supreme Court recently heard oral argument in Bockting v. Bayer, 399 F.3d 1010 (9th Cir.2005), cert. granted, ___ U.S. ___, 126 S.Ct. 2017, 164 L.Ed.2d 778 (2006), in which the Court will decide the extent of Crawford's retroactivity, and presumably will offer analogous guidance on the retroactivity of Davis. I share my colleagues' premise that, at a minimum, Crawford and Davis will be afforded pipeline retroactivity and thus be declared applicable at least to all matters that were pending trial or were on direct appeal when those cases were decided.[3]See Powell v. Nevada, 511 U.S. 79, 80, 114 S.Ct. 1280, 1281, 128 L.Ed.2d 1, 5 (1994). In the unlikely event that prediction is mistaken, then obviously the judgment we render here is ill-founded, and we shall need to reconsider the matter further.
The doctrinal test expressed by the Supreme Court in Davis is presently incomplete. As my colleagues note, Davis held that:
[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is *748 no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
[___ U.S. at ___, 126 S.Ct. at 2273-74, 165 L.Ed.2d at 237.]
This multi-factor construct resolves only two of several possible scenarios. One scenario is where there is an "ongoing emergency" when the declarant speaks or writes and the "primary purpose" of the interrogation is "to enable police assistance to meet [that] emergency." Ibid. In that scenario, the statement is admissible. A completely opposite scenario is where there is no ongoing emergency and the primary purpose of the interrogation is "to establish or prove past events potentially relevant to later criminal prosecution." In that particular scenario, Davis instructs that the statement is inadmissible. Ibid.
What the Supreme Court does not tell us in Davis is how we should handle scenarios where either (l) there is an ongoing emergency but the interrogation's primary purpose is retrospective, or (2) there is no ongoing emergency but the interrogation's primary purpose is only prospective. Since the fact patterns in Davis and Hammon involved neither of these possibilities, the Supreme Court did not need to address them.
Nor does Davis contemplate the sticky circumstance in which the "primary purpose" of a declarant's interview is unclear, or where the interview is being conducted for dual or multiple purposes. Again, we are left without clear guidance, since the appellate records in Davis and Hammon apparently did not reflect such ambiguous or mixed purposes, at least for eight members of the Court.[4]
The circumstances before us appear to raise such interstitial uncertainties implicated by the Davis holding. From my own reading of the record, I am persuaded, as is the majority, that there was no "ongoing emergency" when N.M. was safely ensconced in a hospital room and was being interviewed by DYFS worker Nurudeen. It is less obvious, however, that the "primary purpose" of Nurudeen's interview was forward-looking, i.e., to protect the welfare of the child, or backward-looking, i.e., to memorialize statements from the child that could establish past events and be potentially used in a future prosecution.
On balance, I tend to agree with the majority that, on the particular record before us, the primary object of the DYFS interview, particularly after Nurudeen spoke with the prosecutor's representative at the hospital, was to establish past events and to assist in the already-initiated criminal investigation. However, I do recognize that there are countervailing proofs in the record, including Nurudeen's testimony perceiving that her role at the hospital was "just to make sure that the child is safe."
By channeling the constitutional analysis into a "primary purpose" rubric, Davis also causes a perhaps-unintended oversimplification of the task of understanding why people talk with one another. Here, our task is to determine the primary purpose of a DYFS case worker's interview. The general statutory mission of DYFS in the "protection of children" through civil legal measures is well-established. See N.J.S.A. 9:6-8.8. See also State v. P.Z., 152 *749 N.J. 86, 96, 703 A.2d 901 (1997). To be sure, DYFS frequently must interact with law enforcement personnel. See, e.g., N.J.S.A. 9:6-8.36a (requiring DYFS to "immediately report all instances of suspected child abuse and neglect . . . to the county prosecutor"); see also State v. P.Z., supra, 152 N.J. at 98-99, 703 A.2d 901 (cataloguing various obligations and functions of DYFS in assisting in the prosecution of crimes against children).
Nonetheless, if one is compelled to identify a single dominant purpose of Nurudeen's hospital interview of N.M. here, I am inclined to agree with my colleagues that the interview was mainly to assist law enforcement in having the child report what had or had not happened to him while he was in the defendant's care and custody. Yet the interview also clearly had an additional benefit in revealing information that would be relevant in deciding with whom the child could safely go home after his medical treatment had been completed. Forced to choose, I concur with the majority's assessment that the child's statement to Nurudeen was "testimonial," as that term has come to be defined in Crawford and Davis.[5]
I also wish to stress that our disposition of this case should not be viewed as a per se holding that all DYFS interviews of children conducted after law enforcement have become involved in a matter are necessarily "testimonial" under the Sixth Amendment. Nor are we deciding that all DYFS workers are agents of law enforcement for purposes of the Confrontation Clause, although I recognize that the marked trend of post-Crawford/post-Davis case law around the country appears pointed in the direction of such a rule for child welfare workers employed by governmental bodies. See the cases cited ante at 255-56, 912 A.2d at 744-45.
Lastly, I must observe that reaching a fair and just disposition of this appeal is procedurally complicated by the fact that the record before us was not developed with any regard for the dispositive factors ultimately announced by the Supreme Court in Davis. Although one might consider remanding this matter for the development of a supplemental record, the numerous practical difficulties attendant to such an exercise, and the consequent delay of this case involving events which transpired long ago in 2002, weigh against it.
With these caveats in mind, I join in the judgment directing a new trial, mindful that this case will surely not represent the last signpost on the evolving path of Confrontation Clause jurisprudence.
NOTES
[1] See also State v. Branch, 182 N.J. 338, 371, 865 A.2d 673 (2005), declining to decide if, under the state constitution, a witness must be unavailable as a condition to the admission of an excited utterance against a criminal defendant.
[2] The victim's mother, Christine [M], pled guilty to abuse, cruelty and neglect of a child, N.M., on the theory that she allowed the second and third physical assaults to occur by not believing that defendant had committed the first one, despite evidence and warnings from her family that N.M. was being abused by defendant.
[3] The State, while contending that the statement clearly included what N.M. was told to say, does not claim that it was merely offered for the fact it was stated and was used only for that purpose. Accordingly, we do not permit its admission on that basis, particularly in the absence of a limiting instruction. Further, the prejudice in terms of its substantive use to support defendant's guilt is clear. In fact, the prosecutor concluded her summation by stating:

Now, a lot of people came before you and testified. But you didn't see one person in the courtroom, but you heard from him, you heard one small voice, one little 3-year old voice, and you heard it twice. You heard it the first time with regard to the July 30th incident. You heard that little boy say, "Daddy beat me." And then you heard it again when Ms. Nurudeen testified. What did you hear? "I fell down."
Did anybody beat you?
"Daddy says nobody beat me. I fell down while I was sleeping."
It's not, Mommy says nobody beat me, not, [n]obody beat me, but "Daddy says nobody beat me."
[4] We invited supplementary briefs after the Davis opinion was filed.
[5] While the confrontation clause does not apply to "non-testimonial" evidence, the Court noted "that statements made in the absence of any interrogation" may be "testimonial" in some circumstances not developed in the opinion. Ibid. n. 1. Moreover, the due process clause requires hearsay evidence to be reliable. See California v. Green, 399 U.S. 149, 163, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489, 500, n. 15 (1970). See also Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980), overruled in Crawford (requiring "particularized guarantees of trustworthiness").
[6] The Davis jury "did not hear the complete 911 call," and the Court noted that defendant did not challenge the state court's conclusion that "even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt." Ibid.
[7] The Court also reminded us that the right of confrontation may be "forfeited" when the State proves at a hearing that defendant "obtain[ed] the absence of a witness by wrongdoing." Id. at ___, 126 S.Ct. at 2280, 165 L.Ed.2d at 244. Here, the State does not claim the victim was "unavailable" due to fear of defendant or otherwise. Therefore, we need not address that issue or how a child abuse victim may testify because he or she is traumatized. See, e.g., State v. Smith, 158 N.J. 376, 383-87, 730 A.2d 311 (1999).
[8] The report will be noted in the upcoming Criminal Practice Report. We also note that in a supplementary brief we invited, the prosecutor, although referring to the need for urgency, stated "[a]n analysis of the DYFS worker's actions and goals reveals that they were much like that of the 911 operator . . ." in Davis, who was treated as an agent of law enforcement. In any event, DYFS workers are not required to give Miranda warnings to the parties they interview. See J.S. v. R.T.H., 155 N.J. 330, 346, 714 A.2d 924 (1998); State v. P.Z., supra, 152 N.J. at 112, 703 A.2d 901 ("refusing to extend a parent's right to counsel or right to Miranda warnings to Title Nine investigations by DYFS workers because that 'would shift the primary focus of Title Nine from the right of children to be protected from abuse and neglect to the rights of parents to the custody of their children. Those rights are not in equipoise." J.S., supra, 155 N.J. at 346, 714 A.2d 924).
[9] Both the majority and dissenting opinions in Davis would apparently find no problem with the admission of defendant's own statement because that would pose no issue under the confrontation clause. Id. at ___ _ ___, 126 S.Ct. at 2281-83, 165 L.Ed.2d at 246-47, n. 2 (Thomas, J., concurring and dissenting).
[10] In his discussion of Crawford in Branch, both of which were decided before Davis, Justice Albin noted:

The Crawford Court noted that "the only question presented in White was whether the Confrontation Clause imposed an unavailability requirement on the types of hearsay at issue" and that White's "holding did not address the question whether certain of the statements, because they were testimonial, had to be excluded even if the witness was unavailable." Ibid. In limiting White, supra, to the narrow question that it addressed, the Crawford Court expounded that "to the extent the hearsay exception for spontaneous declarations existed at all [at the time of the adoption of the Bill of Rights], it required that the statements be made `immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage.'" Ibid. (quoting Thompson, supra, 90 Eng. Rep. at 179). Consequently, White's holding that the Confrontation Clause does not impose a requirement of a declarant's unavailability for the introduction of an excited utterance is very much in doubt with regard to out-of-court statements that are the product of police interrogation. Crawford, supra, is a reminder that even firmly established exceptions to the hearsay rule must bow to the right of confrontation.
[Branch, supra, 182 N.J. at 369-70, 865 A.2d 673.]
[11] The statement to the child's mother was not testimonial, and it appears that most courts treat statements to family members, particularly in close proximity to the event and not in response to any interrogation at the request of the police or otherwise as non-testimonial. See, e.g., State v. Shafer, 156 Wash.2d 381, 128 P.3d 87 (2006); State v. Walker, 129 Wash.App. 258, 118 P.3d 935 (2005).
[1] Among other things, Crawford has been aptly described as creating "a Copernican shift in federal constitutional law." See Latimer, supra, 36 Seton Hall Law Rev. at 329.
[2] To date our State Supreme Court has declined to pass upon the meaning or scope of Crawford, or upon Crawford's impact, if any, on the cognate provision of confrontation expressed in our State Constitution at Article 1, Paragraph 10. See State v. Branch, 182 N.J. 338, 370-72, 865 A.2d 673 (2005).
[3] I hazard no prediction on whether the Court will go further and declare Crawford retroactively applicable to cases on collateral review. See Beard v. Banks, 542 U.S. 406, 411, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494, 502 (2004) (delineating the standards for when a new rule of criminal procedure applies on collateral review).
[4] Justice Thomas observed in dissent in Davis that in "many similar cases, pronouncement of the `primary' motive behind [a declarant's] interrogation calls for nothing more than a guess by courts." Davis, supra, ___ U.S. at ___, 126 S.Ct. at 2285, 165 L.Ed.2d at 249 (Thomas, J., concurring and dissenting).
[5] I have no similar difficulty with the admission of N.M.'s "blurt-out" statement to his mother, which seems plainly nontestimonial under Crawford and Davis.