No. 92,251

STATE OF KANSAS, *Appellee,* v. ELROY D. HENDERSON,
*Appellant.*
(160 P.3d 776)

Opinion filed June 22, 2007.

*Roger L. Falk,* of Law Office of Falk & Owens, P.A., of Wichita, argued the cause, and *Christopher Hughes,* of the same firm, was with him on the briefs for appellant.

*David Lowden,* chief appellate district attorney, argued the cause, and *Charles L. Rutter,* assistant district attorney, *Nola Tedesco Foulston,* district attorney, and *Phill Kline,* attorney general, were with him on the briefs for appellee.

*Alice Anna Phillips,* senior attorney, of American Prosecutors Research Institute, of Alexandria, Virginia, was on the brief for *amicus curiae* American Prosecutors Research Institute.

The opinion of the court was delivered by

NUSS, J.: A jury convicted Elroy D. Henderson of one count of aggravated indecent liberties with a child. On appeal, Henderson primarily argued his confrontation rights were violated when the jury was allowed to watch a videotaped interview of the 3-year-old victim without her testifying at trial. The Court of Appeals agreed. After holding that sufficient evidence remained to support his conviction, it reversed and remanded for a new trial. *State v. Henderson,* 35 Kan. App. 2d 241, 129 P.3d 646 (2006). Both the State and Henderson petitioned this court for review under K.S.A. 20-3018(b).

The issues on appeal, and our accompanying holdings, are as follows:

1. Was Henderson's right to confrontation violated when the jury watched the videotaped interview? Yes.

2. Did Henderson forfeit his right to confrontation by essentially making the victim witness unavailable to testify due to her young age? No.
3. Absent the videotaped interview, is the remaining evidence sufficient to support Henderson's conviction? Yes.

Accordingly, we reverse and remand for a new trial.

## FACTS

At the end of February 2003, Jami I. (Mother) noticed a discharge from the vagina of her 3-year-old daughter F.J.I. In addition to the discharge, F.J.I. had complained her stomach and "potty place" were hurting. Because Mother believed F.J.I. probably had a bladder infection, she scheduled an appointment at the Wichita Clinic for March 3. The examination that day revealed a urinary tract infection. Test results available 3 days later revealed F.J.I. had gonorrhea. Mother was informed of these results on March 6 by the clinic's nurse practitioner, Jean Harris.

Harris suspected child abuse. Because she knew she was required to report her suspicions and would be asked by Child Protective Services about possible perpetrators, Harris asked Mother if she knew of any possible molester of her daughter. According to Harris, Mother said that only her ex-boyfriend Elroy D. Henderson, a/k/a "Donte" or "Tae," had had unsupervised access to F.J.I.

According to Mother's later trial testimony, early in the morning on February 24, 2003, she and Henderson had had unprotected consensual intercourse at her house. Later that day while Mother was at work, Henderson and F.J.I. were alone together from 8:30 a.m. to 3 p.m.

After Mother's discussion with Harris on March 6 at the clinic, while there she submitted a vaginal culture of her own for testing. That same day Harris called Child Protective Services of the Kansas Department of Social and Rehabilitation Services (SRS) to make her report. According to Mother's testimony, Mother called SRS and was later contacted by Detective Cherney of the Sedgwick County Sheriff's Office. As confirmed by Detective Cherney's later probable cause affidavit, on that day he and SRS social worker Lori Chandler—both members of the Exploited and Missing Children

Unit (EMCU)—were notified of a 3-year-old female, F.J.I., who had been diagnosed with gonorrhea.

According to Cherney's affidavit, the next day, March 7, he and Chandler interviewed F.J.I.'s mother. The interview occurred at a state office building in Wichita. The affidavit asserted that Mother told Cherney that she had brought her 3-year-old daughter to the Wichita Clinic on March 3 because she was complaining about pain in her vaginal area. Mother gave Cherney a copy of the test results which showed positive for gonorrhea.

Cherney's affidavit also asserted that Mother asked F.J.I. who touched her "potty in a bad way." F.J.I. replied, "Tae touched my potty with his ding ding." Mother told Cherney and Chandler that "Tae" was the nickname of her ex-boyfriend Henderson.

According to the affidavit, Mother told Cherney that she had broken up with Henderson in January 2003, but got back together with him the following month. Henderson came to her house around February 24, 2003, to baby sit F.J.I. and her son, and Mother had unprotected sexual intercourse with him during the week of February 24. Mother told Cherney that Henderson had been alone with F.J.I. and her son at her house.

F.J.I. was also interviewed at the state office building by Cherney and Chandler. Mother was present during the interview, which was video and audiotaped. At trial, Mother denied making any attempt before the interview to tell F.J.I. who had molested her, to suggest Henderson was the perpetrator, or to indicate in any fashion what to tell the detectives.

During the interview, F.J.I. was asked to name various parts of the body based upon a drawing of a girl; F.J.I. identified several parts. She called her backside a "body" and her front genital area a "potty."

The following then occurred, as transcribed by Cherney from the tape:

"LC [Chandler]: Are you a girl?
"FI [victim]: Uh huh (positive).
"LC: You are? Did you know that girls have three parts that nobody should touch?
"FI: No.

"LC: You didn't know that, okay. Well you know what? There's three. Look this one. What's this?
"FI: Hhm, I told you it's a body.
"LC: A body, you're right. That's what you said. It's a body and that nobody is supposed to touch us on our body. Did you know that?
"FI: Tae touched my body and it was hurting.
"LC: He did?
"FI: With the ding ding.
"LC: With the ding ding?
"FI: Uh huh (positive).
"LC: What's a ding ding?
"FI: It goes on my body.
"LC: Okay.
"FI: It goes on [F.J.I.'s] body.
"LC: On [F.J.I.'s] body?
"FI: Uh huh. (Positive)."

When asked where she was when Tae touched her, F.J.I. responded that she was hiding behind her mother's bed at her Grandma's house because she "[did not] want Tae to touch [her]."

Chandler also presented a diagram of a male to F.J.I.

"LC: Okay, I'm going to show you a picture of a boy, okay?
"FI: Okay.
"LC: . . and I want you to show me where, what a ding ding is, cause I don't know what a ding ding is. Will you help me with that?
"FI: Uh huh (positive). What's on your page?
"LC: Okay, I want you to help me with this one.
"FI: Okay.
"LC: Okay, where, what is a ding ding? What's a ding ding?
"FI: Hhm, look.
"LC: What? What's that?
"FI: I don't know.
"LC: You don't know?
"FI: That's a hot dog.
"LC: A hot dog?
"FI: Uh huh (positive).
"LC: Oh, right here.
"FI: It's a hot dog.
"LC: Hot dog. Okay, I'll write that. Hot dog, okay. Where is the ding ding?
"FI: It's lives in the boys body.
"LC: It's in the boys body right there by the hot dog?
"FI: Uh huh (positive).
"LC: Okay, okay so did you see Tae's ding ding?

"FI: Uh huh (positive).
"LC: You did?
"FI: Yeah.
"LC: What did it look like?
"FI: He pushed it down and put it on [F.J.I.'s] body.
"LC: He pushed it down and put in on [F.J.I.'s] body?
"FI: Uh hun (positive)."

F.J.I. later identified the front genital area of her body when asked where the "ding ding" touched her. She stated that she took her diaper off and let Tae touch her body. F.J.I. further stated that Tae had green hair; however, based on further questioning, she could not correctly identify colors.

Detective Cherney participated to a much lesser extent than Chandler in the interview. He primarily asked F.J.I. to demonstrate with his pen and folder what she meant by "top," "inside" and "beside." In response, she only put the pen on top of the folder, moving it around several times.

Three days after the interviews of Mother and F.J.I., on March 10, 2003, Mother learned from her lab test results that she too had gonorrhea. That same day she notified Cherney of the results.

On October 20, 2003, Cherney filed his affidavit, dated October 17, in a criminal case, stating that he had probable cause to believe that Henderson had committed the offense.

Chandler and Cherney were unable to locate Henderson until 3 days later, October 23, when he turned himself in to the Wichita Police Department. During this interview, Henderson initially denied babysitting F.J.I. on February 24, 2003; he later, however, admitted that he had. He also admitted having consensual, unprotected intercourse with Mother but denied that he had sexually abused F.J.I. When discussing the allegations, Henderson referred to his penis as a "ding-ding," as F.J.I. had.

Henderson admitted that he had sought treatment for a sexually transmitted disease more than once. His medical records revealed that he had been treated for chlamydia in October 2001. Henderson also stated that he had an appointment to be tested for sexually transmitted diseases on February 18, 2003, but he had skipped it for lack of money. According to Chandler, Henderson said the

missed appointment had been to test for gonorrhea. However, Detective Cherney could not remember whether Henderson said he was to be specifically tested for gonorrhea or sexually transmitted diseases in general.

That same month, Henderson was charged with one count of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A).

On January 21, 2004, pursuant to K.S.A. 60-460(dd), the State moved to admit two statements made by F.J.I. First, the State sought to admit F.J.I.'s statements made on March 6, 2003, during her follow-up visit to the Wichita Clinic. According to the State's proffer of Harris' testimony, after receiving the news of F.J.I.'s positive test for gonorrhea, Mother "turned to F.J.I. and asked, 'Did Tae hurt you, did Tae mess with you?' F.J.I. nodded in the affirmative that that had happened." Second, the State sought to admit the March 7 videotaped interview conducted by Chandler and Cherney.

At the motion hearing, F.J.I. was asked a series of questions outside of the jury. After F.J.I. was dismissed, the district judge determined that she was unavailable as a witness:

"[I]t's my belief that from the testimony in the courtroom, in the presence of counsel and the defendant, [F.J.I.] is unable to really understand completely the questions. She is unable to understand the importance of this proceeding, and particularly it's apparent to me that she is unable to understand the application of the oath, the relevance of the oath or the requirement to tell the truth; and so I'm going to find that she is incapable of fully understanding the duty of a witness to tell the truth pursuant to K.S.A. 60-417, subsection (b), and will declare her and disqualify her from testifying in this case and will find her to be unavailable as a witness pursuant to K.S.A. 60-459 and pursuant to the case law with regard to K.S.A. 60-460(dd)."

In the court's second step of analysis, it considered the reliability of F.J.I.'s statements. It refused to admit F.J.I.'s affirmative responses to her Mother's questions in Harris' presence, holding they did not possess a particularized guarantee of trustworthiness because F.J.I. demonstrated that "she could be led to agree with clearly incorrect statements." However, the court held that F.J.I.'s statements during the videotaped interview did possess the req-

uisite trustworthiness and would be admitted. Henderson was granted a continuing objection to admission of the videotaped interview, primarily on Confrontation Clause grounds.

At trial Mother, Harris, Chandler, and Cherney testified for the State as to the previous events. During Cherney's testimony, the videotape was played to the jury.

Dr. Katherine Melhorn also testified for the State. She described how gonorrhea is transmitted and how it manifests itself with children. According to the doctor, although gonorrhea is spread through mucosal contact, it does not require actual intercourse or penetration; rather, close contact with the penis or vagina is often enough. Because gonorrhea dies rapidly when outside of the body, Dr. Melhorn testified that it is unlikely a child could contract gonorrhea by sitting on a toilet seat recently used by a carrier. However, she did acknowledge that gonorrhea could possibly be passed by a washcloth if it was shared within a short period of time.

Henderson testified on his own behalf. He stated that February 24, 2003, he was dating a woman named Eva Shunatona but acknowledged that around 3 a.m. he went to Mother's house and engaged in consensual intercourse with her. Later that morning, Mother asked him to babysit F.J.I., as well as her younger brother. Before Mother left for work, she changed F.J.I.'s diaper and stated that she thought F.J.I. had a yeast infection or a urinary tract infection and that she was taking F.J.I. to get checked at the end of the week. Henderson noticed a yellowish discharge coming from F.J.I.'s vagina.

After that day, Henderson did not see Mother again until June or July 2003. On that occasion, Henderson asked Mother why she gave his name to the detectives for something she knew he did not do. According to Henderson, Mother apologized and said that the matter had been dropped.

Henderson testified that he babysat F.J.I. again in September 2003, and she called him "Daddy" because of their father/daughter type of relationship. According to him, after he found out he was wanted by police, he turned himself in to the authorities. While he admitted testing positive for chlamydia twice, he denied ever hav-

ing gonorrhea. Henderson also denied touching F.J.I. in any way with his penis.

Henderson's former girlfriend, Eva Shunatona, and his current girlfriend, Miranda Helphingtine, also testified that they engaged in unprotected sexual intercourse with him. Both women denied contracting a sexually transmitted disease from him; however, only Helphingtine had been tested. Helphingtine also testified that she and Henderson had seen F.J.I. in August, September, and October 2003 with Mother's knowledge.

The jury found Henderson guilty of aggravated indecent liberties with a child. Henderson was sentenced to 59 months' imprisonment, with 36 months of postrelease supervision.

Henderson appealed. During the time between his January 26-27, 2004, jury trial and the March 10, 2006, Court of Appeals decision, the United States Supreme Court released *Crawford v. Washington,* 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), which dealt with the Confrontation Clause of the Sixth Amendment to the United States Constitution. Accordingly, the Court of Appeals addressed *Crawford,* holding that admission of the videotape violated Henderson's confrontation rights. It reversed his conviction but held that sufficient evidence remained to support his conviction, allowing remand for a new trial. *Henderson,* 35 Kan. App. 2d 241, Syl.

Three months later, on June 19, 2006, while both parties' petitions for review to this court were pending, the United States Supreme Court released *Davis v. Washington,* 547 U.S. 813, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006), another Confrontation Clause case. We granted review, and the State filed a supplemental brief addressing *Davis.*

Additional facts will be supplied as necessary to the analysis.

## ANALYSIS

Issue 1: *Henderson's right to confrontation was violated when the jury watched the videotaped interview.*

### Standard of review

The State argues the Court of Appeals erred in reversing Henderson's conviction and remanding for a new trial by holding

F.J.I.'s videotaped statement was testimonial. Henderson responds that the statement was testimonial and should have been excluded. Both sides essentially acknowledge that although *Davis,* 547 U.S. 813, and *Crawford,* 541 U.S. 36, postdate Henderson's trial, both decisions apply to the instant case. See *State v. Meeks,* 277 Kan. 609, 613-14, 88 P.3d 789 (2004) (applying *Crawford* to direct appeals pending at the time the decision was issued).

The Sixth Amendment's Confrontation Clause provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *Crawford,* 541 U.S. at 42. The Sixth Amendment is applied to the States through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403-06, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965). Similarly, the Kansas Constitution provides a criminal defendant the right "to meet the witnesses face to face." Kan. Const. Bill of Rights, § 10. Whether a defendant's right to confrontation has been violated is a question of law subject to unlimited review. See *State v. Nguyen,* 281 Kan. 702, 714, 133 P.3d 1259 (2006) (when the underlying facts are undisputed, this court's review of whether a Confrontation Clause issue arose is de novo).

## *The test for "testimonial"*

In *Crawford,* 541 U.S. 36, the defendant was charged with assault and attempted murder for stabbing Kenneth Lee, who had allegedly tried to rape Crawford's wife. After he was arrested, both Crawford and his wife gave statements to police. At trial, Crawford's wife did not testify due to the marital privilege. When Crawford asserted self-defense, the State sought to rebut Crawford's theory with his wife's recorded statement to police that she did not see anything in the victim's hand when Crawford attacked him. The trial court admitted the statement, finding that there were "adequate indicia of reliability" as required by *Ohio v. Roberts,* 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980).

The United States Supreme Court reversed Crawford's conviction and clarified the test for confrontation issues: If the declarant is unavailable to testify at trial, and the declarant's statement is "testimonial," then the testimony is not admissible unless the de-

fendant had a prior opportunity to cross-examine the declarant. 541 U.S. at 59. The Court opined: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 541 U.S. at 69. In *Meeks*, 277 Kan. at 613-14, we acknowledged that *Crawford* "substantially altered the Confrontation Clause analysis" of *Ohio v. Roberts*, 448 U.S. 56, and *Roberts*' resultant Kansas case law.

Because (1) F.J.I.'s videotaped statement was made out of court, (2) she was unavailable due to her inability to fully understand the duty to tell the truth, and (3) Henderson had no opportunity to cross-examine, the parties agree that per *Crawford*, the dispositive issue for this court to determine is whether F.J.I.'s statement was testimonial. While *Crawford* expressly declined to provide a comprehensive definition, it observed that at a minimum the term included "statements taken by police officers in the course of interrogations." 541 U.S. at 52.

The *Crawford* Court also held that various formulations of the core class of testimonial statements included "pretrial statements that declarants would reasonably expect to be used prosecutorially" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51-52. We focused on this *Crawford* language in *State v. Lackey*, 280 Kan. 190, 201, 120 P.3d 332 (2005), *cert. denied* 547 U.S. 1056 (2006), to hold that an officer's interview with a witness conducted during the police investigation resulted in a testimonial statement because "an objective witness would think [it] would be used for trial and could arguably be construed as a police interrogation."

Two years after *Crawford*, the United States Supreme Court revisited the *Crawford* testimonial analysis in *Davis*, 547 U.S. 813. That case actually involved two consolidated cases: *Davis v. Washington* and *Hammon v. Indiana*.

In *Davis*, the statement at issue was a portion of the victim's 911 call. The caller told the 911 operator that defendant Davis had hit her; later in the conversation she stated that Davis had " 'just r[un] out the door.' " 547 U.S. at 818. At trial, although the victim did

not testify, the statement was admitted over Davis' objection that it violated his right to confrontation.

In *Hammon*, the statement at issue was made to officers at the victim's home. After police responded to a reported domestic disturbance, the victim wrote a statement detailing Hammon's abusive conduct. The victim did not testify at trial. Nevertheless, an officer authenticated the statement and also testified about what the victim told him. Hammon repeatedly objected to admission of the evidence.

In analyzing the facts of *Davis* and *Hammon*, the Supreme Court again expressly declined to provide a comprehensive definition of "testimonial." 547 U.S. at 822. However, the Court enunciated a general test to help resolve the specific facts presented there:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial *when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.*" (Emphasis added.) 547 U.S. at 822.

The *Davis* Court clarified that in *Crawford* it had considered testimonial hearsay in the context of law enforcement officers' interrogations: " 'interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation . . . is testimonial.' " 547 U.S. at 826. It also observed that " '[a]n accused who makes a formal statement to governmental officials bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' " 547 U.S. at 824 (quoting *Crawford*, 541 U.S. at 51).

The Court observed that the inquiry in both the *Davis* and *Hammon* cases also took into account several factors, including: (1) whether the declarant was speaking about events as they were actually happening, instead of describing past events; (2) whether the declarant made the statement while in immediate danger, *i.e.*, during an ongoing emergency; (3) whether the statement was made in order to resolve an emergency or simply to learn what had hap-

pened in the past; and (4) the level of formality of the statement. 547 U.S. at 827. After looking at these factors, the Court concluded that the victim's statement in response to a 911 operator's interrogation (*Davis*) was not testimonial; however, the woman's written statement to police (*Hammon*) was testimonial. 547 U.S. at 828-30.

In the instant case, the parties contend that the *Davis/Hammon* test controls, which they characterize as determining whether, objectively considered, the interview's primary purpose is to establish or prove past events potentially relevant to later criminal prosecution. We generally agree. As the United States Supreme Court stated:

"The question before us in *Davis*, then, is whether, *objectively considered,* the interrogation that took place in the course of the 911 call produced testimonial statements. . . .

. . . .

"We conclude from all this that the circumstances of McCottry's interrogation [in *Davis*] *objectively indicate its primary purpose* was to enable police assistance to meet an ongoing emergency. . . .

. . . .

". . . *Objectively viewed, the primary, if not indeed the sole, purpose of the investigation* [in *Hammon*] was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.

. . . "[T]hese features certainly strengthened the statements' testimonial aspects [and] made it more *objectively apparent . . . that the purpose of the exercise* [in *Hammon*] was to nail down the truth about past criminal events." (Emphasis added.) 547 U.S. at 826-30.

Indeed, at least one commentator has observed that *Davis* evidenced a fundamental shift in the guidance provided by *Crawford*:

"The *Davis* . . . reasoning represents a conspicuous departure from the *Crawford* ruling. The *Crawford* Court had focused on the mindset of the declarant: Did she give her statement under circumstances in which she could foresee the later prosecutorial use of her words? [Citing 541 U.S. at 65-69.] The *Davis* opinion shifted the focus from the declarant's state of mind to the officers' purpose in questioning the declarant." Lininger, *Reconceptualizing Confrontation after Davis,* 85 Tex. L. Rev. 271, 280 (December 2006) (citing *Davis,* [547 U.S. at 822]).

*Davis* did not address, however, what part, if any, the mindset of the declarant still plays in the testimonial calculus, much less

the mindset of a child declarant as in the instant case. On the one hand, the Missouri Supreme Court has characterized the *Davis* test as "an objective, totality of the circumstances test" and apparently still considered in its calculus the 4-year-old victim's awareness that her statements could be used to prosecute. *State v. Justus,* 205 S.W.3d 872, 879 (Mo. 2006); see *People v. Learn,* 371 Ill. App. 3d 701, 712-20, 863 N.E.2d 1173 (2007) (Grometer, J., specifically concurring) (young age of declarant apparently no obstacle to examining her state of mind or how a reasonable person in her position would regard the statement).

On the other hand, the Idaho Court of Appeals has held that the test based upon the declarant's expectations has been discredited by *Davis. State v. Hooper,* 2006 WL 2328233, unpublished opinion filed August 11, 2006 (Idaho App. 2006), *rev. granted* January 18, 2007. In between these two viewpoints is *State v. Rangel,* 199 S.W.3d 523, 532-35 (Tex. App. 2006), *rev. granted* December 20, 2006, which considered the 4-year-old declarant's expectations. Then, in the alternative, it essentially determined the expectations unnecessary under its facts and a state statute: "[R]egardless of what the 4-year-old girl thought her statements would be used for, *i.e.,* that they could be used against appellant as evidence in a criminal case, they were clearly admitted at trial to function as testimony against appellant." 199 S.W.3d at 535.

The *amicus* American Prosecutors Research Institute urges us to adopt an age-equivalent standard when determining whether a child's statement is testimonial. In support, it cites six studies evaluating what children understand about court and court-related concepts. Like the Court of Appeals, we expressly reject its specific argument that the videotaped interview was not testimonial solely because a 3-year-old child would have no reasonable expectation her statements will later be used at trial. We observe that its argument heavily relies upon the language from *Crawford,* 541 U.S. at 51-52, that describes testimonial statements as those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Indeed, the case upon which it principally relies, *State v. Bobadilla,* 709 N.W.2d 243 (Minn. 2006), was decided before

*Davis.* We also observe that under the Institute's argument, the prosecution is allowed to have its cake and eat it too: The victim is too young to be competent to testify, as the district court found with 3-year-old F.J.I., but not too young to have her statement placed in evidence by the State with no attendant defense right to confront and cross-examine.

In the instant case concerning child victim testimony, we agree with the Missouri Supreme Court in *Justus*: A young victim's awareness, or lack thereof, that her statement would be used to prosecute, is not dispositive of whether her statement is testimonial. Rather, it is but one factor to consider in light of *Davis'* guidance after *Crawford.* Until we receive further guidance from the United States Supreme Court, our test is an "objective, totality of the circumstances" test to determine the primary purpose of the interview, as discussed and seemingly applied in *Davis.* See 547 U.S. at 822, 826-830.

*The instant case*

While our parties agree on the need for determining whether F.J.I.'s videotaped statement was testimonial, they disagree on whether the statement was testimonial under our facts.

While the State acknowledges that a sheriff's department detective was involved in F.J.I'.s interview, it argues: "The interview was conducted in a manner consistent with Kansas statutes clearly stating the primary purpose of any report of child abuse is to protect the welfare of the child, regardless of whether a law enforcement officer, a social worker, or both are involved."

In our analysis, we will first examine the language of the statutes substantially relied upon by the State. We will next determine how the videotaped interview was actually conducted, *e.g.,* whether the facts demonstrate it was conducted to carry out the statutes' purposes.

K.S.A. 38-1521 establishes the general Kansas policy of protecting children from abuse or neglect and the accompanying need for investigations of such reports, stating in relevant part:

"It is the policy of this state *to provide for the protection of children who have been subject to physical, mental or emotional abuse or neglect or sexual abuse* by

encouraging the reporting of suspected child abuse and neglect, *insuring the thorough and prompt investigation of these reports and providing preventive and rehabilitative services when appropriate to abused or neglected children and their families so that, if possible, the families can remain together without further threat to the children.*" (Emphasis added.)

K.S.A. 38-1523(a) elaborates upon the need for investigation of reports of child abuse or neglect and states in relevant part:

"The state department of social and rehabilitation services and law enforcement officers shall have the duty to receive and investigate reports of child abuse or neglect for the purpose of determining whether the report is valid and whether action is required to protect the child from further abuse and neglect. *If the department and such officers determine that no action is necessary to protect the child but that a criminal prosecution should be considered, the department and such law enforcement officers shall make a report of the case to the appropriate law enforcement agency.*" (Emphasis added.)

Subsection (b) provides for joint investigations of reports between SRS and the appropriate law enforcement agencies:

"When a report of child abuse or neglect indicates (1) that there is serious physical injury to or serious deterioration or *sexual abuse of the child and* (2) *that action may be required to protect the child, the investigation shall be conducted as a joint effort* between the department of social and rehabilitation services and the appropriate law enforcement agency or agencies, with a free exchange of information between them. If a statement of a suspect is obtained by the law enforcement agency, a copy of the statement shall be provided to the department of social and rehabilitation services on request." (Emphasis added.)

Subsection (d) establishes the hierarchy in light of a dispute between the investigating agencies. It states: "If a dispute develops between agencies investigating a reported case of child abuse or neglect, *the appropriate county or district attorney shall take charge of, direct and coordinate the investigation.*" (Emphasis added.)

Finally, subsection (f) acknowledges the need for cooperation among the investigating agencies to protect the child: "Law enforcement agencies and the department of social and rehabilitation services shall assist each other in taking action which is *necessary to protect the child regardless of which party conducted the initial investigation.*" (Emphasis added.)

We first acknowledge that the State is generally correct: The statutes do concern protection of Kansas children from abuse and neglect. The statutes' purpose is not as pure as the State suggests, however. They also provide for certain mandatory action by law enforcement. For example, if SRS and law enforcement determine that a criminal prosecution should be considered, they *shall* make a report to the appropriate law enforcement agency. K.S.A. 38-1523(a). The statutes further provide that if a report indicates sexual abuse and that action may be required to protect the child, the investigation *shall be conducted as a joint effort between SRS and law enforcement*. K.S.A. 38-1523(b). Finally, and most important, the supremacy of the criminal prosecution factor is clear: In the event of a dispute between the investigating agencies, the *prosecuting attorney shall* take charge of, direct, and coordinate the investigation. K.S.A. 38-1523(d).

With this understanding of the places that law enforcement and criminal prosecution occupy in the statutes, we next determine how F.J.I.'s interview was conducted. The State argues that the primary purpose of the interview was not to establish past events to prosecute Henderson but "merely to determine whether F.J.I. had been sexually abused by anyone, including her own mother, after her gonorrhea test was confirmed" and "to protect her from additional abuse." It further argues that the purpose was "to determine the circumstances surrounding the abuse, the current living environment of the child, the potential for further abuse from the perpetrator or others, and whether it was safe to return the child home."

Consistent with this theme, the State specifically argues it needed to review Mother's story for accuracy:

"It is noteworthy that while the *mother* indicated defendant was the only person with unsupervised access to the child, the social worker and law enforcement officer would have been derelict in their duties if they simply assumed she [mother] was being truthful or accurate in her assessment of the situation."

The State also argues the existence of an ongoing emergency:

"Given the confirmed diagnosis of gonorrhea, the authorities had an immediate and ongoing emergency, especially since three-year-old F.J.I. had no control over where her mother would take her. The law enforcement officer and the SRS

worker needed to immediately determine whether any other person could have been the perpetrator and whether it was safe to send the child home."

By contrast, Henderson emphasizes that the interview purpose was not to protect F.J.I.'s welfare. Henderson notes, among other things, that he—the alleged perpetrator—had not been in F.J.I.'s home for at least 2 weeks at the time of the interview, thus distinguishing it from the typical situation where SRS may need to remove a child from a home environment. He contends that the " 'primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution' " of him. See *Davis*, 547 U.S. at 822.

We agree with Henderson that the facts do not support the State's arguments.

To determine the primary purpose of the videotaped interview, we need to examine the circumstances. We begin by reviewing what information the interviewers had before the interview began. According to Detective Cherney's affidavit, the day before the interview he and Chandler knew that a 3-year-old female, F.J.I., had been diagnosed with gonorrhea, which he characterized as a sexually transmitted disease.

Apparently Cherney asked Mother to bring herself and F.J.I. for interviews because the next day he and Chandler did independently interview Mother and daughter. There, they learned Mother had taken F.J.I. to the Wichita Clinic 4 days earlier because she was complaining about pain in her vaginal area; he received a copy of test results confirming the gonorrhea.

According to the affidavit, the interviewers learned that Mother had asked F.J.I. who touched her " 'potty in a bad way,' " and F.J.I. had replied: " 'Tae touched my potty with his ding ding.' " Mother identified Tae, the perpetrator, as her ex-boyfriend Henderson.

According to the affidavit, the interviewers also learned that Mother had broken up with Henderson in January 2003, but that she also had unprotected sexual intercourse with him at her house during the week of February 24. They also learned that Henderson was alone with F.J.I. and Mother's son in Mother's home at that time.

According to Chandler's trial testimony, the interviewers learned that Mother not only had unprotected sex with Henderson but also with two other men during the same time frame. One man was a boyfriend named Mike, last name unknown, and the other man was named Love. Mother also told them that F.J.I. had been attending a child day care center.

Armed with this information, Chandler and Cherney began their F.J.I. interview.

As for the State's position that the primary purpose of the interview was to protect F.J.I. and faithfully determine whether she had been abused by anyone, including her own mother, we note that Mother was present in the small room throughout F.J.I.'s interview. The videotape reveals that Mother occasionally spoke to F.J.I., apparently to get her to respond to some of the questions, and corrected her when she misstated her age. We also note that no questions were asked about whether Mother had abused F.J.I.—although Chandler and Cherney presumably knew that Mother herself was still awaiting her own test results for gonorrhea. While the possibility of a mother's sexual abuse of her own daughter is unpleasant to consider, an experienced detective (17 years) and an experienced social worker, both of whom work in the EMCU, should be aware such conduct is possible. *Cf. In re J.D.D.,* 21 Kan. App. 2d 871, 908 P.2d 633 (1995) (affirming the termination of a mother's parental rights for long-term abuse, including beating son with curtain rod and belt and holding his head under water). Although Cherney's affidavit does not provide a date for his interview with a physician, Dr. Katherine Melhorn, he learned that sexual intercourse is not required to transmit gonorrhea. In short, gonorrhea is at least medically possible to transmit from an infected mother to a daughter.

On this same theme, we also note that the possibility exists that Mother influenced her daughter, despite her denial at trial, to blame Henderson. As mentioned, after receiving the news of F.J.I.'s positive test for gonorrhea at the clinic on March 6, Mother turned to F.J.I. and asked, "Did Tae hurt you?" "Did Tae mess with you?" F.J.I. nodded affirmatively. The trial judge found this was a leading question that could elicit an affirmative response and

further found F.J.I. unavailable as a witness because of her suggestibility:

"This [Mother's questions to F.J.I. at the clinic] was the first indication the Court has that Mr. Henderson might have — and I think anyone — some role in [F.J.I.'s] situation and possibly having been abused sexually. . . . [F.J.I.'s] response to Mr. Bennett's [prosecutor's] questions during our hearing yesterday indicated that she could be led to agree with clearly incorrect statements with an affirmative response, and that is a specific leading question that could elicit an affirmative response. . . .

". . . And, so I'm not going to allow that nod of the head or that affirmative response to be presented to the jury . . . . The Court will note that it — might be admissible for some other purpose."

As for the State's contention that the interview was to determine whether F.J.I. had been sexually abused by "anyone," and to determine "the potential for further abuse from the perpetrator [Henderson] or others" ( e.g., Mother), we further note that no abuse questions were asked about anyone besides Henderson. While we concede F.J.I. identified him, that identification does not exclude the possibility of other perpetrators.

As for the State's contention that the interviewers could not assume Mother was being truthful or accurate when she said Henderson was the only person with unsupervised access to F.J.I., we note that no questions were asked of F.J.I. about that issue. The State's assertion is also contradicted by Chandler's testimony. Chandler testified that she and Cherney did not follow up an investigation with the boyfriend named Mike, the man named Love, or the child day care facility where F.J.I. had been attending. She also testified that they did not interview anyone else besides Henderson after the March 7, 2003, date, even though they knew from Mother on March 10 that, like her daughter, she too had gonorrhea and therefore could have transmitted the disease to F.J.I. Chandler explained these decisions by stating that Mother told them only Henderson had had unsupervised contact with F.J.I. Chandler also explained that there was no need to look for anyone else because in the interview F.J.I. had identified Henderson as the perpetrator. Yet as demonstrated above, the possibility exists that Mother suggested Henderson as the perpetrator to F.J.I. while at the medical

clinic the day before—which the district court found was the first indication in the record that Henderson was the perpetrator. The court further made a finding that F.J.I. was suggestible, as demonstrated in the courtroom. In short, Chandler's possession of these two pieces of information—Mother saying that only Henderson had unsupervised access to F.J.I .and F.J.I. accusing him during the interview—does not establish that Mother was being truthful, nor does it exclude the possibility of other perpetrators.

As for the State's position that the interviewers were concerned about F.J.I'.s current living environment, about whether it was safe to return F.J.I. to her home, and how to protect her from further abuse, we note that there were no questions asked of F.J.I. about her home situation and potential further abuse there. We assume this void is simply because Chandler and Cherney knew from their prior interview with Mother that Henderson was not living in the home; that the entire encounter—sex with Mother and his baby-sitting of F.J.I.—had represented a contact of less than 24 hours during the last month or two. The lack of questions on this issue suggests that the interviewers had concluded that only an outsider, Henderson, and not possibly those in the home environment, was the cause of F.J.I.'s problems.

As for the State's contention that the videotaped statement was not testimonial because an immediate and ongoing emergency existed—because F.J.I. had no control over where her mother would take her and because Cherney and Chandler needed to determine whether someone besides Mother could have been the perpetrator—we note that Mother apparently brought F.J.I. to the state office building. We again note that Mother was allowed to sit in for the entire interview. She then was apparently allowed to take F.J.I. back home after the interview. No questions were asked of F.J.I. about her mother in the interview. No questions were asked of any possible perpetrators except Henderson. The record on appeal does not disclose whether any questions were ever asked of F.J.I. except on the videotape.

As partially evidenced by our rejection of the State's specific arguments, we conclude that Henderson was the focus of the interviewers even before the videotaped interview began. We ac-

knowledge that the videotape and transcript do not indicate that either interviewer suggested him as a perpetrator to F.J.I. In response to a generic question, F.J.I. appears to volunteer his name and his action: "Tae touched my body [with his ding ding] and it was hurting." However, as mentioned, they did nothing after their earlier interview with Mother to follow up regarding other possible perpetrators or to check Mother's veracity or otherwise eliminate her as a suspect, even though they learned she had gonorrhea like her daughter. It could certainly be argued that they felt no need to follow up after F.J.I.'s identification of Henderson, except that the district court, after observing her answer questions just as Chandler and Cherney observed her, later found her highly suggestible. We also note that shortly after F.J.I.'s accusation against Henderson, Chandler showed her a preprinted diagram labeled "black, teenager, male." Henderson was a black male aged 20 at the time of the interview. The videotape does not reveal that F.J.I. informed Cherney and Chandler of Henderson's age or race; presumably this information came from Mother, and Chandler was therefore prepared before the interview began to show such a diagram to F.J.I.

While a focus on Henderson does not itself conclusively prove that the primary purpose of the interview was to establish or prove past events potentially relevant to a later criminal prosecution of him, it is certainly a factor to consider in making that determination. At a minimum, the focus on Henderson dilutes the State's arguments. We also consider that, among other things, F.J.I. was being asked to recount past episodes of criminal activity involving Henderson. *Davis v. Washington,* 547 U.S. 813, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006), held that Crawford's and Hammond's

"statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony because they do precisely *what a witness does* on direct examination; they are inherently testimonial." 547 U.S. at 830.

This focus on Henderson, specifically with an eye toward prosecuting him, is corroborated by events after the interview. Cherney

attempted to reach Henderson but was unsuccessful for 8 months. During that time, neither he nor Chandler attempted to interview anyone else or locate other possible perpetrators, whether pursuing the information given by Mother's interview or otherwise. Indeed, before even interviewing Henderson, Cherney prepared and signed his affidavit that asserted he had probable cause to believe Henderson committed the offense.

In addition to the facts we have already outlined as comprising part of our testimonial analysis, we also consider that Cherney and Chandler are government employees. While Chandler, the main interviewer, was an SRS employee, she could be considered an agent of law enforcement. See *Davis,* 547 U.S. at 823 n.2 (911 operator could be considered agent of law enforcement when conducting interrogation of 911 callers). Indeed, Cherney was a detective, sat in on the interview, and participated in asking several clarifying questions of F.J.I. Additionally, the interview was conducted in a government building (see *Crawford v. Washington,* 541 U.S. 36, 53, 158 L. Ed. 2d 177, 124 S. Ct. 1354 [2004]) and was part of a governmental investigation. See K.S.A. 38-1523.

We further observe that the interview was conducted in a formal setting, with question and answer format (*Davis,* 547 U.S. at 830), and was recorded, with both video and audiotape. *Crawford,* 541 U.S. at 53 n.4. There was no emergency; F.J.I. was speaking of past events and Henderson was not in her home; her demeanor was calm. See *Davis,* 547 U.S. at 826-32 (contrasting nonemergency cases of *Crawford* and *Hammon* with emergency case of *Davis*).

As part of this calculus, we also find it important to consider that Cherney, a detective, was continuously involved in the process from the start. He took the initial information on March 6 and apparently was the one who asked Mother and F.J.I. to come to the building to be interviewed. He was involved in both the interview of Mother and of F.J.I. Afterward, he was involved in the decision to not interview or attempt to locate anyone besides Henderson. He was also involved in the attempts to locate Henderson and in the interview of Henderson. Finally, Cherney drafted the affidavit of probable cause which directly led to Henderson's arrest.

In short, his participation in F.J.I.'s videotaped interview on March 7 was just one stage in the detective's involvement. While this amount of participation may be allowed, and even be encouraged by the statutes, *e.g.*, K.S.A. 38-1523, the statutes cannot transform an investigation whose primary purpose is prosecution into one whose primary purpose is protection of the child from abuse or neglect. As the *Crawford* Court stated: "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar." 541 U.S. at 56 n.7.

We also consider the similar facts, rationale, and holding of *State v. Justus*, 205 S.W.3d 872 (Mo. 2006). *Justus* is of particular guidance because it concerns a Confrontation Clause issue not only involving a young victim of abuse, but also because it was decided post-*Davis* and used a *Davis*-based analytical model. The Missouri Supreme Court characterized the analysis in *Davis* as "[a]pplying an objective, totality of the circumstances" test. 205 S.W.3d at 879.

There, defendant allegedly molested his 4-year-old daughter. Similar to the instant case, the trial court found that the daughter was unavailable as a witness—although due to severe emotional distress. It allowed into evidence several of her hearsay statements told to others, including a videotape interview by a social worker. On appeal, the defendant alleged a violation of his confrontation rights.

The mother testified that after her daughter returned home from visitation with her father, she wet her bed and was afraid to sleep. The grandmother testified that the girl rubbed her private area and said she did it because daddy "rubs me there." After learning more information from the girl, the grandmother called the child abuse hotline.

The grandmother took the girl, then 4, to an office where she met with Cynthia Debey, who investigates child abuse and neglect for the division of family services. Debey interviewed the girl in a visitation room and asked if the girl had anything to tell her about what her father had done. The girl then described certain sexual

acts and said that she knew Debey would protect her from her father.

Debey then referred the girl to Joyce Estes, a counselor and social worker for the Northwest Missouri Children's Advocacy Center. Estes performed forensic interviews of children alleging abuse and provided counseling, assessment, and evaluation services. Estes performed a "forensic interview" with the girl—which she described as "an official legal interview done for law enforcement" and serving an investigatory "fact-finding purpose." When the girl began disclosing some statements about the abuse 10-15 minutes into the interview, Estes took her to another room "so the interview could be videotaped and audiotaped." 205 S.W.3d at 876. Like the present case, the girl was shown diagrams of female and male figures and described several private parts.

The Missouri Supreme Court found that in both the Debey and Estes interviews, the girl's statements were made in a formal setting in a question-and-answer format. It further found that her statements to Debey were made as part of a government investigation of a hotline call and were made in a governmental facility. 205 S.W.3d at 880.

The court also found that the girl's statements made to Estes were made in an interview room and, although not a government worker, "[s]he was acting as a government agent when she interviewed [girl], as the division of family services made the referral to Estes to perform a 'forensic interview' on [girl]. In Estes' words, this meant an official interview done for law enforcement." 205 S.W.3d at 880.

The court further found that the Estes interview was performed to preserve the girl's testimony for trial; once she began to disclose abuse details, Estes escorted her to another room for the sole purpose of recording the conversation. It also found that Estes, and even the girl (based upon her statement to Estes that she would tell a judge what her father had done), were aware of the purpose of the interview. 205 S.W.3d at 880.

The court rejected the State's assertion that the girl's statements were in the middle of an "ongoing emergency" because the evidence showed she was not in any immediate danger; she was speak-

ing about past events. The court also noted that her demeanor in the videotaped interview was calm. It also found: "While there is no doubt that one purpose of the interrogations was to enable assistance to the child, the circumstances indicate that their primary purpose was to establish or prove past events potentially relevant to later criminal prosecution." 205 S.W.3d at 880. The *Justus* court concluded: "The circumstances of this case objectively indicate the primary purposes of the interrogations was to establish past events relevant to a later criminal prosecution. [The girl's] statements to *both* witnesses were testimonial." (Emphasis added.) 205 S.W.3d at 880-81.

The *Justus* court acknowledged that while several courts had addressed the child victim hearsay issue in light of *Crawford*, the majority of those cases had been written without the benefit of *Davis* and *Hammon*. 205 S.W.3d at 880 n.10. We independently observe that a number of other cases decided since *Davis* appear to have followed the same approach as did the *Justus* court and produced similar results. See *State v. Blue*, 717 N.W.2d 558, 563-64 (N.D. 2006) ("Even before *Davis*, the cases that interpreted *Crawford* noted the context and circumstances in which a statement is made is important in determining whether a statement is testimonial"; forensic interviewer's interview of 4-year-old girl at Children's Advocacy Center was testimonial); *State v. Buda*, 389 N.J. Super. 241, 255, 912 A.2d 735 (2006) ("[C]ourts across the country following *Crawford* have held that statements to a governmental agent investigating an allegation of abuse or a witness assessing the circumstances relating to the claim of possible child abuse are 'testimonial,' because of the potential of a criminal prosecution . . . . The holdings remain the same after *Davis*." Three-year-old victim's statement to family service specialist investigating possible abuse was testimonial.); *State v. Pitt*, 209 Or. App. 270, 278-79, 147 P.3d 940 (2006) (court appeared to apply a totality of the circumstances test and held that child services' forensic child interviewer's interviews of 4- and 5-year-old girls were testimonial); *Hernandez v. State*, 946 So. 2d 1270, 1280-84 (Fla. Dist. App. 2007) (statement testimonial because of four main factors: The Child Protection Team is an arm of law enforcement, law enforce-

ment involved in production of the statements, purpose of the examination conducted by the Child Protection Team nurse was partly to perform law enforcement functions, and absence of any ongoing emergency; court concluded nurse's questions were functional equivalent of police interrogation and statement was testimonial.); *Rangel v. State*, 199 S.W.3d 523, 534-35 (Tex. App. 2006), *rev. granted* December 20, 2006 (child's videotaped statements to Child Protective Services investigator were testimonial; court examined a variety of factors to form conclusion, *i.e.*, victim describing past events, lack of emergency, videotaping, and structured, formalized questioning).

Unpublished opinions in the same vein include: *People v. Sharp*, 2006 WL 3635393, unpublished opinion filed December 14, 2006 (Colo. App. 2006), *reh. denied* February 22, 2007, *cert. dismissed* March 30, 2007 (court addressed a number of factors to conclude that 5-year-old child's videotaped statements to private forensic interviewer were functional equivalent of police interrogation and testimonial); *State v. Hooper*, 2006 WL 2328233, unpublished opinion filed August 11, 2006 (Idaho App. 2006), *rev. granted* January 18, 2007 (child's videotaped statements to sexual trauma nurse, while police officer watched from adjoining room, were testimonial; court examined a variety of factors to form conclusion, determining that nurse functioned as agent of police).

We acknowledge that *Justus* has several distinguishing facts. These include an admitted official legal interview done for law enforcement by Estes, a decision to record the interview only after allegations of abuse were made in an apparent desire to preserve testimony, and a 4-year-old victim who essentially acknowledged awareness of the interview's purpose when she said would tell a judge what her father had done. Nevertheless, these distinctions are not strong enough to overcome *Justus*' similarities with the instant case or the additional factors present here that were analyzed earlier. We can therefore conclude with guidance from *Justus* that while one purpose of the interview was to enable some assistance to F.J.I., the circumstances of this case objectively indicate that its primary purpose was to establish past events potentially relevant to a later criminal prosecution of Henderson.

Accordingly, F.J.I.'s videotaped statement was testimonial and was improperly admitted into evidence. Its improper admission logically leads us to determine whether the error was harmless or reversible under *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967). See *State v. Lackey,* 280 Kan. 190, 201-02, 120 P.3d 332 (2005), *cert. denied* 547 U.S. 1056 (2006) (Confrontation Clause violations are subject to the constitutional harmless error analysis). Based upon *Chapman,* we have stated that the harmless error rule in cases involving constitutional concerns is as follows: "If this court possesses a firm belief beyond a reasonable doubt that an error of constitutional magnitude had little, if any, likelihood of having changed the result of the trial, it may be declared harmless. [Citation omitted.]" *State v. Swanigan,* 279 Kan. 18, 45, 106 P.3d 39 (2005).

The State's loss of the videotaped statement substantially dilutes the strength of its case in several ways. The tape was the only evidence before the jury where the victim herself identified her abuser. Moreover, we should not underestimate the emotional impact upon a jury of a 3-year-old girl stating that the defendant, a 20-year-old male, "touched my body [with his ding ding] and it was hurting." Additionally, the loss of F.J.I.'s use of "ding ding" on the tape to identify a penis considerably lessens the importance of Henderson's later use of that unique term with the detectives. And certainly without the videotape identification of Henderson, the possibility of a different perpetrator transmitting gonorrhea to F.J.I. looms larger. The list includes those with possible unsupervised access such as the boyfriend named Mike and the man named Love, both of whom had unprotected sex with Mother during the same time frame as Henderson, as well as those at the child day care facility. The list includes Mother who, like her daughter, had gonorrhea.

As a result, we do not possess a firm belief beyond a reasonable doubt that the inclusion of F.J.I.'s videotaped statement had little likelihood of changing the result at trial. We reverse and remand this case for a new trial at which the videotape is not admissible. This prohibition includes the information that only F.J.I. revealed in the videotape to which witnesses might attempt to testify. See

*Davis,* 165 L. Ed. 2d 224 (affidavit from absent victim Hammon and officer's testimony concerning what victim had told him about the same events were both barred as testimonial).

Our decision today does not prevent law enforcement from investigating crimes. As the United States Supreme Court has stated: "Police investigations themselves are, of course, in no way impugned by our characterization of their fruits as testimonial. . . . The Confrontation Clause in no way governs police conduct, because it is the trial *use* of, not the investigatory *collection* of, *ex parte* testimonial statements which offends that provision." *Davis,* 547 U.S. at 832 n.6.

Issue 2: *Henderson did not forfeit his right to confrontation by essentially making the victim witness unavailable to testify due to her young age.*

The State argues that even if we hold F.J.I.'s statement to be testimonial, Henderson forfeited his right of confrontation through his wrongdoing.

The Supreme Court has held that under the doctrine of forfeiture by wrongdoing, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis,* 547 U.S. at 833. The rule "extinguishes confrontation claims on essentially equitable grounds." *Crawford,* 541 U.S. at 62 (citing *Reynolds v. United States,* 98 U.S. 145, 158-59, 25 L. Ed. 244 [1878]). This court applied the rule post-*Crawford* to reject a Confrontation Clause claim in *State v. Meeks,* 277 Kan. 609, 615-16, 88 P.3d 789 (2004). There, we held that the State showed by a preponderance of the evidence that Meeks procured the absence of the witness at trial by murdering him, even though the witness' murder was the charge for which Meeks was on trial. 277 Kan. at 615.

The State acknowledges that there is no evidence that Henderson threatened F.J.I. before or after the assault or that he in some way procured her unavailability; rather, it argues that F.J.I. was unavailable due to her incompetence as a witness because of her age and her inability to understand the duty to tell the truth. Nevertheless, the State asserts that where a defendant assaults a young

child who is incapable of testifying at trial, the "forfeiture doctrine" should apply regardless of whether the defendant committed some act independent of the crime charged.

In rejecting the State's argument, the Court of Appeals stated: "The State cites no case to us where the doctrine of forfeiture has been applied solely due to the declarant's age." 35 Kan. App. 2d at 254. The State asserts, however, that the absence of case law should not lead to a contrary result because "[t]he same equitable factors underlying the use of the doctrine in murder cases is present in this case and other cases involving helpless victims with limited communication skills."

We agree with the Court of Appeals. The State's argument would severely undercut the constitutional rights provided by the Confrontation Clause. Because Henderson's actions did not result in F.J.I.'s unavailability, this argument is rejected.

Issue 3: *Absent the videotaped statement, sufficient competent evidence supports Henderson's retrial and the case may be remanded.*

Although we are reversing and remanding this case for a new trial, we must also address Henderson's argument that absent the videotaped statement, the remaining evidence is insufficient to support his conviction. As we stated in *State v. Pabst*, 268 Kan. 501, 512, 996 P.2d 321 (2000): " '[A] reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause.' *Lockhart v. Nelson*, 488 U.S. 33, 41, 102 L. Ed. 2d 265, 109 S. Ct. 285 (1988); see *Burks v. United States*, 437 U.S. 1, 11, 57 L. Ed. 2d 1, 98 S. Ct. 2141 (1978)." See K.S.A. 21-3108(1)(a).

Our standard of review for this issue is well known:

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Burhans*, 277 Kan. 858, 871, 89 P.3d 629 (2005).

This standard and the standard for determining whether error is harmless or reversible in issue 1 both consider the evidence in the record. The standard of review of the present issue, however,

requires considerably less evidence to sustain the conviction than the amount required to establish the harmlessness of any error. Accordingly, in *Pabst* we concluded that evidence of premeditation was sufficiently convincing under the standard of review to support the conviction, but not overwhelming so as to prevent reversal and remand for new trial on the basis of prosecutorial misconduct. See *State v. Elnicki*, 279 Kan. 47, 68-69, 105 P.3d 1222 (2005) (citing *Pabst*, 268 Kan. at 511).

The Court of Appeals thoroughly addressed Henderson's sufficiency of the evidence argument and rejected it. It stated in relevant part:

"In this case, F.J.I.'s infection with gonorrhea provided a basis for a reasonable factfinder to conclude that F.J.I. had been exposed to some type of sexual contact. Mother's testimony also provided a basis for a reasonable factfinder to conclude Henderson was the only person who had sufficient unsupervised contact with F.J.I. to have transmitted the disease. There was other circumstantial evidence to support that conclusion. Although Henderson attacked the credibility of the various witnesses, an appellate court does not reweigh the evidence, determine the credibility of witnesses, or substitute its view of the evidence for that of the trial court. [Citation omitted.]" 35 Kan. App. 2d at 254-55.

· · We also observe that Mother had had unprotected sex with Henderson shortly before the purported incident between Henderson and her daughter. Like her daughter, Mother also contracted gonorrhea. A physician testified that while gonorrhea transmission does not require intercourse but rather close contact with a penis or vagina, it probably is not transmitted via a toilet seat. Henderson admitted he was to have been tested for a sexually transmitted disease the week before the incident. Chandler testified that Henderson told her the test was to have been for gonorrhea. Finally, while Henderson initially denied ever babysitting F.J.I., he then admitted to it.

We agree with the Court of Appeals' sufficiency of evidence holding. Reviewing all of the remaining evidence, viewed in the light most favorable to the State, we conclude that a rational factfinder could have found Henderson guilty beyond a reasonable doubt. While not all of the evidence was harmful to Henderson, an appellate court does not reweigh the evidence, determine the

credibility of witnesses, or substitute its view of the evidence for that of the trial court. See *Swanigan*, 279 Kan. at 23. Further, a conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Holmes*, 278 Kan. 603, 632, 102 P.3d 406 (2004). Accordingly, the decision of the Court of Appeals is affirmed on this issue.

The judgment of the Court of Appeals reversing the conviction and remanding the case with directions to the district court is affirmed. The judgment of the district court is reversed and remanded with directions.

JOHNSON, J., not participating.
BRAZIL, S.J., assigned.