O’Donnell, J.,
dissenting.
{¶ 71} The issue in this case concerns whether the trial court violated Michael Arnold’s constitutional right to confront the witnesses against him when it admitted hearsay statements that Arnold’s four-year-old daughter, M.A., made to Kerri Marshall, a medical forensic interviewer at the Center for Child and Family Advocacy at Nationwide Children’s Hospital, who interviewed M.A. as part of the investigation into allegations of sexual abuse. I agree with the majority that Marshall acted as an agent of law enforcement when she interviewed M.A. because Marshall had a purpose to collect information for use by the police. *311 However, because the majority also decides that Marshall simultaneously acted as an agent of medical professionals, rendering M.A.’s statements relevant to diagnosis and treatment nontestimonial, notwithstanding Marshall’s primary purpose to collect that same information for the police, I respectfully dissent.
Facts and Procedural History
{¶ 72} Michael Arnold and Wendy Otto married in their teens and had two children: a girl, M.A., who was four years old at the time relevant to this case, and a boy, M.S.A., who was five. The couple had a volatile relationship, which included physical violence, accusations of infidelity, and an unsubstantiated claim that Arnold had abused M.S.A. According to Arnold’s mother, Wendy had made up stories involving the children to get back at Arnold for cheating on her. After Wendy filed for divorce in July 2005, Arnold moved to Ohio. However, the two reconciled, and in November 2005, she followed him to Ohio.
{¶ 73} On the evening of December 7, 2005, Wendy fell asleep in the living room with M.S.A., but noises upstairs woke her, and she went to the bedroom to investigate. Arnold, however, had locked the bedroom door, and she yelled for him to open it. Once he did, she saw his “boxers halfway off on his side” and M.A. lying on the couple’s air mattress. She pulled a blanket off of M.A. and discovered her daughter’s underwear around her ankles. At that point, she told Arnold to leave. He told Wendy that nothing happened, but he left the house when she called 9-1-1. Paramedics and officers responded, and M.A. told firefighter-paramedic Charles Fritz that someone touched her private area. Fritz took Wendy and both children to the emergency room at Children’s Hospital, where authorities performed a rape-kit examination on M.A.
{¶ 74} Wendy received instructions to take M.A. to the Center for Child and Family Advocacy at Children’s Hospital (the “CCFA”) the next morning. The CCFA is a child-advocacy center, which is defined by R.C. 2151.425(A) to mean “a center operated by participating entities * * * to perform functions and activities and provide services * * * regarding reports * * * of alleged sexual abuse of a child or another type of abuse of a child.” Pursuant to R.C. 2151.426(A), the participating entities operating a child-advocacy center may include children’s services, law enforcement, and the prosecuting attorney. The Columbus Police Department, the prosecutor, and children’s services all have offices in the CCFA building.
{¶ 75} Kerri Marshall, a medical forensic interviewer working for the CCFA, interviews children when there are allegations of sexual or physical abuse. These interviews are recorded on DVD and observed on closed-circuit television by the nurse or doctor who will perform a physical examination, law enforcement, a children’s services caseworker, and sometimes a prosecutor. According to Marshall, her interview is for purposes of medical diagnosis and treatment. Howev *312 er, she also explained the purpose of having doctors, nurses, detectives, children’s services caseworkers, and prosecutors watch the interview: “Before we were all in the same building. You know, we would do the same process. I would interview the children. They would have their medical exam done. We would forward our reports on to medical services, law enforcement. They will have to review [ — ] law enforcement may have to interview the child. So in this way we set it up so the child will have to go through one interview. The child won’t have to relive the story again. So that’s really the purpose of having the other — the other people there watching the interview.” Thus, the interview had a goal to obtain enough information so that law enforcement would not have to reinterview the child.
{¶ 76} In this case, Gail Horner, a nurse practitioner, Monte Nommay, a police detective, Joelle Nielson, a victim advocate, and Vanise Dunn, a children’s services caseworker, observed the interview. Marshall interviewed M.A. in a separate room with DVD cameras. She explained to M.A. that she would ask her some questions and that a nurse would give her a check-up, and she attempted to build a rapport with introductory questions; however, the interview quickly focused on the prior night’s events:
{¶ 77} “And who takes care of you?
{¶ 78} “A. My mom and my dad.
{¶ 79} “Q. Your mom and your dad take care—
{¶ 80} “A. But my dad’s not at my home.
{¶ 81} “Q. Your dad’s not at your home? How come?
{¶ 82} “A. Because he got in jail.
{¶ 83} “Q. Him got in jail. Okay. How come him got in jail? What did daddy do?
{¶ 84} “A. Nothing. He just got in jail.”
{¶ 85} Marshall continued asking M.A. why Arnold had gone to jail, and M.A. explained that he had done something to Wendy and that they had been fighting. M.A. also stated that Arnold had locked the bedroom door and that neither she nor Wendy were in the room, but upon further questioning, M.A. revealed that she had been in the bedroom with Arnold sleeping on the bed.
{¶ 86} When that line of questioning stalled, Marshall asked M.A. whether she had ever been to a doctor for a check-up. M.A. responded, “Today.” When Marshall asked why, M.A. said, “Because my legs were hurting.” Marshall did not explore the source of M.A.’s medical complaint, but instead returned the focus to Arnold’s arrest:
*313 {¶ 87} “Your legs were hurting? Okay. Now, when daddy — you said daddy went to jail and him not at the home, who took daddy to jail?
{¶ 88} “A. Cops.
{¶ 89} “ * * *
{¶ 90} “Q. Who called the cops?
{¶ 91} “A. My mom.
{¶ 92} “Q. Why did she call the cops?
{¶ 93} “A. Because them was fighting.”
{¶ 94} Marshall asked why Otto had to call the police, and continued:
{¶ 95} “I don’t understand what your mom and dad were fighting about. Were they fighting about something that happened to you? Yeah? Okay. I just want you to tell the truth, that’s all I want you to do. Okay. You are not in any trouble. Okay? I am going to tell you the truth, [M.A.], and I want you to tell me the truth. Okay? So your mom and your dad were fighting about something that happened to you.
{¶ 96} “A. I can’t — I can’t say it.”
{¶ 97} Marshall then brought out a picture of a girl and had M.A. identity the parts of her body. She then continued questioning M.A.:
{¶ 98} “[W]hat would you do if someone touched one of your private parts? What would you do?
{¶ 99} “A. You get in trouble.
{¶ 100} “Q. Who gets in trouble?
{¶ 101} “A. Him.”
{¶ 102} Upon further questioning, M.A. denied that anyone had touched or put anything in her private parts. Marshall then asked whether anyone had asked her to keep a secret:
{¶ 103} “Has your mom ever told you to keep a secret?
{¶ 104} “A. Yeah.
{¶ 105} “Q. What secret did your mom tell you to keep?
{¶ 106} “A. (Inaudible.)
{¶ 107} “Q. How about your dad? Did your dad ever tell you to keep a secret?
{¶ 108} “A. No.
{¶ 109} “Q. No? Has anyone ever told you not to tell?
{¶ 110} “A. No.
{¶ 111} “Q. No? Well, I don’t understand how come there were cops at your house last night and how come you had to go to the doctor’s across the street.
*314 {¶ 112} “A. Because.
{¶ 113} “ * * *
{¶ 114} “Q. Did mommy ever come in the bedroom when the door was locked when you and dad were sleeping? Did mom ever come in?
{¶ 115} “A. Oh, yeah.
{¶ 116} “Q. Yeah. What did mom see when she came in?
{¶ 117}. “A. My underwear was off.
{¶ 118} “Q. Your underwear was off? Okay. How did your underwear get off?
{¶ 119} “A. Because my dad took them off.
{¶ 120} “Q. Oh, okay. And then what happened when your dad took your underwear off? Do you want to say it really fast in my ear what happened? After dad took your underwear off?
{¶ 121} “A. (Inaudible) My dad-—
{¶ 122} “Q. Took your underwear off? And then what?
{¶ 123} “A. (Inaudible) and pee-pee with me.
{¶ 124} “Q. Your daddy took your underwear off and touched your pee-pee?
{¶ 125} “A. No. And was doing pee-pees.
{¶ 126} “Q. And was what?
{¶ 127} “A. Him was touching my pee-pee. But he was doing pee-pees with me. That’s why he got in jail.”
{¶ 128} On further questioning, M.A. explained that Arnold’s “pee-pee” went inside her “pee-pee,” that he had touched her “pee-pee” with his hand, that he had been on top of her while “playing pee-pees,” that his “pee-pee” had touched the outside of her “butt,” and that his mouth had touched her “pee-pee.”[2] Once Marshall had this information, she did not ask M.A. about any other instances of abuse or any other potential abusers, but rather remained focused on Arnold and reconfirmed this specific instance of abuse.
{¶ 129} Marshall then took M.A. to Horner, the nurse, for a physical exam. According to Horner’s testimony, she would have conducted a head-to-toe examination of M.A. regardless of M.A.’s answers to Marshall’s questions, but she explained that “that forensic interview guides my exam in that it lets me know whether or not I need to test the child for sexually transmitted infection.” The *315 physical exam of M.A. revealed abrasions on the hymen consistent with a penetrating injury.
{¶ 130} Based on this interview, the state charged Arnold with two counts of rape in violation of R.C. 2907.02. Over objection, the trial court found M.A. to be unavailable for trial and that her hearsay statements to Marshall were nontesti-monial and admissible. The state played the video recording of the interview for the jury, which subsequently found Arnold guilty of vaginal rape. The Tenth District affirmed, holding that Marshall was not an agent of the police and that M.A.’s statements were not testimonial.
{¶ 131} We accepted Arnold’s appeal to determine whether Marshall’s interview elicited testimonial statements subject to the Confrontation Clause.
The Confrontation Clause
{¶ 132} The Sixth Amendment to the United States Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.” Prior to 2004, the Supreme Court of the United States had interpreted the Confrontation Clause to permit the state to use the hearsay statements of a declarant who did not appear at trial if the hearsay fell within “a firmly rooted hearsay exception” or if it otherwise bore “particularized guarantees of trustworthiness.” See, e.g., Ohio v. Roberts (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597. Thus, statements made for purposes of medical diagnosis or treatment were admissible notwithstanding the inability of the accused to cross-examine the declarant. White v. Illinois (1992), 502 U.S. 346, 356-357, 112 S.Ct. 736, 116 L.Ed.2d 848, and fn. 8.
{¶ 133} In Crawford v. Washington (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, however, the court recognized that the interpretation of the Sixth Amendment articulated in Roberts could not be reconciled with the historical underpinnings of the Confrontation Clause. It held that the Sixth Amendment “commands, not that [hearsay] evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.” Crawford at 61. Because the Sixth Amendment guarantees the accused’s right to confront those who “bear testimony,” the Confrontation Clause bars admission of testimonial statements unless the witness appears at trial or, if the witness is unavailable, the accused had a prior opportunity for cross-examination. Id. at 51. The court explained that “[w]hatever else the term [‘testimonial’] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.” Id. at 68.
{¶ 134} The Supreme Court revisited the issue in Davis v. Washington (2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court held, “Statements are nontestimonial when made in the course of police interrogation under circum *316 stances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.” Davis at 822. The court held that statements to a 9-1-1 operator made during a police interrogation conducted in response to an ongoing emergency are nontestimonial; however, statements made to police after the emergency had ended are testimonial.
Stahl, Muttart, and Siler
{¶ 135} This court has previously applied Crawford and Davis to determine whether statements admitted at trial were testimonial or nontestimonial.
{¶ 136} In State v. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, we considered whether statements made by a rape victim to a DOVE-unit nurse in the presence of a police officer were testimonial. There, we “adopt[ed] the ‘objective witness’ test in Ohio. For Confrontation Clause purposes, a testimonial statement includes one made ‘under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’ ” Id. at ¶ 36, quoting Crawford, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. We concluded that the victim’s statements to the nurse were nontestimonial because the victim could reasonably have assumed that repeating to a nurse or other medical professional the same information provided to police served a separate and distinct medical purpose from the criminal investigation. Id. at ¶ 46.
{¶ 137} Following Stahl, in State v. Muttart, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, we examined the issue whether a child’s statements to a social worker at the Child Maltreatment Clinic at Mercy Children’s Hospital in Toledo were testimonial. We held that “[statements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under Crawford, because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid.” Id. at ¶ 63. We also noted that “[t]he fact that the information gathered by the medical personnel in this case was subsequently used by the state does not change the fact that the statements were not made for the state’s use.” Id. at ¶ 62. Notably, however, law enforcement had not been involved in the interview or examination.
{¶ 138} The court distinguished Stahl in State v. Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, and, relying on Davis, held that the primary-purpose test applies to a child declarant’s statements made to police or those determined to be police agents: “ ‘[Statements] are testimonial when the circumstances objectively indicate that there is no * * * ongoing emergency, and that the *317 primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.’ ” Id. at ¶ 30, quoting Davis v. Washington, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court rejected the argument that because of a child’s limited understanding of the system of criminal justice, the child could not reasonably expect his or her statements to be used at a later trial, and therefore, the child’s statements to police interrogators are nontestimonial under the primary-purpose test.
{¶ 139} Our cases applying Crawford and Davis thus recognize the use of different standards when the interviewer is an agent of law enforcement and when the interviewer is an agent of a medical provider. When the questioner is an agent of law enforcement, the court, in accordance with Siler, looks to whether the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. When the questioner is a medical professional not related to law enforcement, the court, following Stahl, applies the objective-witness test and determines whether the circumstances would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

The Majority’s Dual-Capacity Test

{¶ 140} Today’s majority, however, charts a course different from the Confrontation Clause jurisprudence of the Supreme Court of the United States and adopts its own dual-capacity test in which the interrogation is examined on a question-by-question basis to determine whether the interviewer acted as an agent of law enforcement or as an agent of some other entity when eliciting a particular statement. Applying this test, it finds that testimonial and nontestimo-nial statements are interspersed throughout Marshall’s interview and that Marshall acted variously as an agent of law enforcement and as a medical examiner. This analysis is contrary to United States Supreme Court jurisprudence, which directs that we should look to the primary purpose of the interrogation, not the secondary or tertiary purpose.
{¶ 141} Here, Marshall acted as an agent of law enforcement when she interviewed M.A., as she asked questions on behalf of the police in the absence of an ongoing emergency to establish or prove past events relevant to later criminal prosecution. The interview she conducted focused solely on confirming the single instance of sexual abuse that Wendy had accused Arnold of committing: the child’s medical history went no further than the night before, Marshall did not ask M.A. about any prior instances of sexual abuse she had experienced, and Marshall did not evaluate whether it would be safe to return the child to live with Wendy. Further, as the majority explains, “the interview was rather formal, more akin to the videotaped, planned interview of Crawford than to the frantic 9- *318 1-1 call or the sequestered but spur-of-the-moment interview recounted in Davis.” Majority opinion at ¶ 35.
{¶ 142} The majority therefore properly holds that M.A.’s statement that Arnold locked the bedroom door with her inside, her descriptions of where her mother and brother were and what Arnold’s boxer shorts and “pee-pee” looked like, and her statements that Arnold had removed both his and her underwear are testimonial because “[t]hese statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state’s investigation.” Majority opinion at ¶ 34.
{¶ 143} Yet the majority determines that Marshall acted as an agent of medical providers when she asked questions in any way relevant to medical diagnosis and treatment, so that the statements that “described the acts that Arnold performed, including that Arnold touched her ‘pee-pee,’ that Arnold’s ‘pee-pee’ went inside her ‘pee-pee,’ that Arnold’s ‘pee-pee’ touched her ‘butt,’ that Arnold’s hand touched her ‘pee-pee,’ and that Arnold’s mouth touched her ‘pee-pee,’ were thus necessary for the proper medical diagnosis and treatment of M.A.” According to the majority, “[i]n eliciting these medically necessary statements, Marshall acted as an agent of the nurse practitioner who examined M.A., not of the investigating police officers.” Majority opinion at ¶ 40.
{¶ 144} In my view, it is not enough that these statements were relevant for medical diagnosis; rather, the question is whether the totality of the circumstances objectively indicate that the primary purpose of the interview was to facilitate medical diagnosis and treatment or whether it was to establish or prove past events potentially relevant to later criminal prosecution.
{¶ 145} It is manifest that Marshall’s questions sought to confirm the allegations of sexual abuse and that proving these past events would be relevant at a criminal prosecution, and the totality of the circumstances indicates that the whole interview served primarily an investigative and prosecutorial purpose. Notably, M.A. revealed the abuse in response to a series of questions asking why her parents were fighting, why the police had come to her house, and why Arnold had gone to jail, and M.A. stated that Arnold “was doing pee-pees” with her and that “[t]hat’s why he got in jail.”
{¶ 146} Thus, M.A.’s recorded statements “are functionally identical to live, in-court testimony, doing ‘precisely what a witness does on direct examination.’ ” Melendez-Diaz v. Massachusetts (2009), — U.S.-, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314, quoting Davis, 547 U.S. at 830, 126 S.Ct. 2266, 165 L.Ed.2d 224. Her statements share the same “ ‘striking resemblance’ of the Crawford statement to civil-law ex parte examinations” that the court recognized in Davis: Marshall separated M.A. from her mother for the interview but not for the physical exam, M.A. “deliberately recounted, in response to police questioning, *319 how potentially criminal past events began and progressed,” and the interview occurred after the incident and any related exigencies had ended. Davis at 830. Further, the CCFA perpetuated the interview for trial.
{¶ 147} The fact that the answers to Marshall’s questions may also be used for a nontestimonial purpose does not mean that M.A.’s statements are not testimonial or that the nontestimonial purpose takes precedence. As the Eighth Circuit Court of Appeals explained in United States v. Bordeaux (C.A.8, 2005), 400 F.3d 548, 556, “That [the child’s] statements may have also had a medical purpose does not change the fact that they were testimonial, because Crawford does not indicate, and logic does not dictate, that multi-purpose statements cannot be testimonial.” Accord State v. Henderson (2007), 284 Kan. 267, 293, 160 P.3d 776, (“while one purpose of the interview was to enable some assistance to [the child victim], the circumstances of this case objectively indicate that its primary purpose was to establish past events potentially relevant to a later criminal prosecution of Henderson”); State ex rel. Juvenile Dept. of Multnomah Cty. v. S.P. (2009), 346 Or. 592, 624, 215 P.3d 847 (recognizing that statements to a child-abuse-evaluation team served dual purposes of providing treatment to the victim and obtaining evidence against the accused, but holding that “statements in a formal setting, in response to structured questions about past events” asked by persons who were proxies for law enforcement, were testimonial).
{¶ 148} Contrary to the majority’s assertion, Davis does not support the proposition that “[t]here is no basis in the law for concluding that Marshall’s dual capacity renders statements made by M.A. for the purpose of medical diagnosis and treatment inadmissible pursuant to the Confrontation Clause.” Majority opinion at ¶ 41. Rather, the United States Supreme Court in Davis emphasized that it had not held that “a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it [in Hammon v. State], ‘evolve into testimonial statements’ 829 N.E.2d, at 457, once that purpose has been achieved.” (Emphasis added.) Davis, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224.
{¶ 149} However, by the majority’s reckoning, the converse occurred here: an interrogation eliciting testimonial statements (i.e., that Arnold locked the door and pulled down M.A.’s underwear) evolved into a conversation to obtain medically necessary statements (i.e., Arnold raped the child). Further, the United States Supreme Court in Davis did not perform the question-by-question analysis that the majority undertakes in this case; rather, the court focused on whether the totality of the circumstances indicate that “the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.” Davis at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.
*320 Ron O’Brien, Franklin County Prosecuting Attorney, and Kimberly Bond, Assistant Prosecuting Attorney, for appellee.
Yeura R. Venters, Franklin County Public Defender, and David L. Strait, Assistant Public Defender, for appellant.
Vorys, Sater, Seymour & Pease, L.L.P., Lisa Pierce Reisz, and Melissa J. Mitchell, urging affirmance for amici curiae Nationwide Children’s Hospital and the Center for Child and Family Advocacy.
Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, Elisabeth A. Long, Deputy Solicitor, and Rebecca L. Thomas, Assistant Solicitor, urging affirmance for amicus curiae Attorney General of Ohio.
Timothy Young, Ohio Public Defender, and Kelly K. Curtis, Assistant Public Defender, urging reversal for amicus curiae Ohio Public Defender.
Ian N. Friedman & Associates, Ian N. Friedman, and Eric C. Nemecek, urging reversal for amicus curiae Ohio Association of Criminal Defense Lawyers.
{¶ 150} In my view, the primary purpose of Marshall’s questioning was to establish what had been done to M.A. and who had done it. Accordingly, M.A.’s statements are testimonial and their admission at trial without a prior opportunity to cross-examine M.A. violated Arnold’s right to confront the witnesses against him.
{¶ 151} Tellingly, this view that statements elicited by interviewers cooperating with law enforcement are testimonial is supported by the weight of authority addressing similar circumstances. See, e.g., Bordeaux, 400 F.3d at 556; People v. Sisavath (2004), 118 Cal.App.4th 1396, 1402, 13 Cal.Rptr.3d 753; State v. Hooper (2007), 145 Idaho 139, 146, 176 P.3d 911; In re Rolandis G (2008), 232 Ill.2d 13, 32-33, 327 Ill.Dec. 479, 902 N.E.2d 600; State v. Bentley (Iowa 2007), 739 N.W.2d 296, 302; State v. Henderson (2007), 284 Kan. 267, 293, 160 P.3d 776; Hartsfield v. Commonwealth (Ky.2009), 277 S.W.3d 239, 245; State v. Justus (Mo.2006), 205 S.W.3d 872; State v. Blue, 2006 ND 134, 717 N.W.2d 558, at ¶ 17-18; State v. Mack (2004), 337 Or. 586, 593, 101 P.3d 349.
{¶ 152} The Confrontation Clause ensures that “evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings.” Maryland v. Craig (1990), 497 U.S. 836, 845-846, 110 S.Ct. 3157, 111 L.Ed.2d 666. Because the principal evil at which the Confrontation Clause is directed is the use of ex parte examinations as evidence against the accused such as occurred in this case, I would reverse the judgment of the court of appeals.

. M.A. also said that Arnold’s “pee-pee” was green, that his “butt” and a needle touched her “butt,” and that his ears touched her “pee-pee,” to which Marshall responded, “[M.A.], this stuff is important.”